This appeal is from a summary judgment granted in favor of defendants, Ross-Clayton Funeral Home, Inc. (Ross-Clayton), Alabama Cemetery Association, Inc., and Arthur King, in an action for damages by plaintiff, Brenda B. Payne, for trespass and for the negligent or wanton destruction of the bodily remains of plaintiff's mother, which was alleged to have caused the plaintiff to become mentally and emotionally upset, sick, and nervous. We reverse and remand.
The appellant's mother, Emma Lee Payne (Emma Lee), died and was buried in Remount Park Cemetery in Montgomery, Alabama, in 1953. Her funeral was conducted by Lee Funeral Home. Twenty-two years later, on August 20, 1975, Alzada Payne, mother of Emma Lee, died. At that time, Brenda went to Ross-Clayton to make funeral arrangements, but did not pick out a casket at that time. Later, Brenda returned with her great-aunt, Laura Mae Payne (Laura Mae), to complete arrangements and to choose a casket. While there, they spoke with Herman Waters, manager of Ross-Clayton, and discussed an insurance policy covering the cost of the funeral and most of the incidental expenses. Appellant contends that during this visit Mr. Waters asked them to pick out a casket, but took them "out in the back yard" to an old barn where a number of old caskets were stored. Laura Mae and Brenda testified in their depositions that these caskets were old, had dirt on them, and appeared to have been in the ground at some point. When Mr. Waters asked if they saw one they wanted, they said that they wanted a new casket and were taken back inside. *Page 1069 
Once inside, they chose a casket and began to complete the funeral arrangements. According to appellant and Laura Mae, Alzada wanted to be buried above Emma Lee. This required that the vault containing the coffin and bodily remains of Emma Lee be dug up and removed from the gravesite so that the grave could be deepened to hold two vaults instead of one. Appellant contends that she requested Fletcher Haynes, now deceased, to do the vault work for her grandmother's burial, since he had previously handled all of that type work for the Payne family, but that Waters stated that Ross-Clayton would take care of all the arrangements. Ross-Clayton, however, contends that the appellant requested Lacy King to do the work and, as a result, they contacted him for the job. A contract was then signed for Ross-Clayton to handle the entire funeral arrangements in return for the proceeds of the burial insurance policy and $285.50 in cash.
A short time later, Ross-Clayton sent a car to take Laura Mae to Remount Park Cemetery to discuss the details of the burial. When she arrived at the gravesite, she found Lacy King and his two sons. Laura Mae testified in her deposition that she did not know that Fletcher Haynes would not be doing the vault work until she arrived at the cemetery. At that time she asked Lacy King who he was and he replied, "[W]e do work for Ross and Clayton." After talking to King, he assured Laura Mae that he could do the work, so she consented and showed him what she wanted done.
About three hours later, Lacy King visited Brenda and Laura Mae and informed them that he and his sons had finished the vault work. He asked them to come to the cemetery to see the work and when they declined he told them he had done something he was not supposed to do. Brenda and Laura Mae testified in their depositions that King informed them that he had opened the casket, that Emma Lee's undergarmets remained in good condition, and that her hair had grown. He then promised that he had "fastened her back up," lowered her back into the vault, and turned everything else over to his son Arthur to finish. Laura Mae and Brenda promised not to say anything to Ross-Clayton about the incident, because, Laura Mae said in her deposition, "[D]uring the family hour, you cannot discuss what has happened. You have to get yourself composed to get yourself together. Death is not an easy thing, especially a loved one."
The funeral of Alzada Payne proceeded without further incident. It was handled totally by Ross-Clayton and to the satisfaction of the appellant.
On or about Mother's Day, 1979, James Payne, brother of Alzada Payne, visited her grave and noticed that it was sinking. Both Laura Mae and Brenda called Mr. Waters at Ross-Clayton, because, Laura Mae said, "[T]hey knew the ones that did the work. They sent them out." A time was then arranged to open the grave to determine the cause of the sinking.
Present at the opening were James Payne, Brenda Payne, Laura Mae Payne, Brenda's two sons, Mr. Waters, a Mr. Harris (to open the grave) and a helper (Field Barnette, who works for the cemetery), and Arthur King (son of Lacy King and one of the two sons alleged to have been present when Lacy King deepened Emma Lee's grave); Lacy King had died in 1977. Upon opening the grave, it was discovered that the vault and casket of Emma Lee Payne were missing. Mr. Waters informed the Paynes of that fact and then left. Laura Mae then approached Arthur King and inquired where the remains of Emma Lee and her casket were. Laura Mae and Brenda said that though he stated he did not know, he was very nervous and they said, "He was shaking. He was absolutely shaking. During the time they were opening that thing, he was shaking."
Shortly thereafter, a meeting was arranged between Brenda and Laura Mae, and Rufus Lewis, Calloway Ross, and Mr. Waters, all of Ross-Clayton, and the wife of Lacy King. At the start of the meeting, only Brenda, Laura Mae, and Rufus Lewis were present. Brenda testified in her deposition: *Page 1070 
"Q. Who spoke first for your family?
 "A. Mr. — my mother[1] spoke first. She asked Mr. Lewis, said, we were over there trying to get — find out that happened to my mother's grave — well, vault and casket. And Mr. Lewis said, well, I am sure we can come to some conclusion. And he said, you know, Mr. Waters and everything, he took care of all the arrangements. He said, what is the problem. And we told him, you know, what Mr. Harris had told us: There was nothing there.
"Q. Who told him?
"A. My aunt told him.
"Q. She did the talking?
 "A. Yes. She did the talking for the first part. And she said, there is nothing there. She said, there should be something. So he said, well, Mrs. Payne, he said, after twenty-five years, do you expect for anything to be in the ground. She said, I most certainly do. She said, if it is nothing but a piece of tin, she said, something should be there. He said, well, I guess you are right.
"Q. Who said that?
 "A. Mr. Lewis. So then he up and said, well, how much money you all want. And we said, well, we can't disclose [discuss?] that. We are on — we have to talk to a lawyer, you know.
"Q. Who said that?
"A. Mr. Rufus Lewis.
"Q. I mean, who said: We can't discuss that?
 "A. My aunt said, we can't discuss that. We have to get a lawyer. Said, but in the meantime, only thing that we really want to know, what happened to everything. That is what we want to know."
Shortly after this conversation, Arthur King arrived and he and the others entered the meeting. Upon questioning Arthur King and receiving no answers to her questions, Laura Mae became quite upset and left. Plaintiff alleges that as she and Laura Mae were leaving, they engaged in a curious conversation with one of Ross-Clayton's employees. Brenda testified:
 "A. . . . And so we left. I said, well, I will talk with you all later. So we left. And as we were getting in the car, Mr. Griffin, one of the employees over there —
"Q. What is his first name?
"A. I don't know his first name.
"Q. He is an employee where?
 "A. He is employed at Ross and Clayton. He turned to my aunt as we were getting in the car. And he said, Mrs. Payne, he said I am so sorry this happened. But, he said, they know what they did with it; they are just so low down they won't tell you. My mamma said, well, that is all right.
"Q. Who did he tell this to?
 "A. He told it to my aunt. I was at the driving — I was right there. I was under the driving wheel, and she was on the passenger side.
 "Q. Who did you understand the they meant in that sentence?
"A. Ross and Clayton."
This action was subsequently filed on January 30, 1980, by Brenda Payne against the Alabama Cemetery Association, Ross-Clayton, and, by subsequent amendment, Arthur King (originally an unnamed defendant). The complaint, as amended, alleged trespass and the negligent or intentional destruction of the bodily remains of Emma Lee Payne. On May 5, 1981, the trial court entered an order stating that no issue of material fact existed between the parties and granting the defendant's motion for summary judgment.
A party moving for summary judgment has imposed upon him the burden of clearly showing that the non-movant cannot recover under any discernible set of *Page 1071 
circumstances and that there is no genuine issue of material fact. Missildine v. Avondale Mills, Inc., 415 So.2d 1040 (Ala. 1981); Fountain v. Phillips, 404 So.2d 614 (Ala. 1981); Butlerv. Michigan Mutual Insurance Co., 402 So.2d 949 (Ala. 1981);Amason v. First State Bank of Lineville, 369 So.2d 547 (Ala. 1979). The party moving for summary judgment must be entitled to a judgment as a matter of law, Missildine v. Avondale Mills,Inc., 415 So.2d 1040 (Ala. 1981); Studdard v. South CentralBell Telephone Co., 356 So.2d 139 (Ala. 1978); BirminghamTelevision Corp. v. Water Works, 292 Ala. 147, 290 So.2d 636
(1974), with all reasonable inferences concerning issues of material fact to be drawn in favor of the non-movant. Butler v.Michigan Mutual Insurance Co., 402 So.2d 949 (Ala. 1981);Papastefan v. B L Construction Co., 356 So.2d 158 (Ala. 1978); Donald v. City National Bank, 295 Ala. 320, 329 So.2d 92
(1976).
The scintilla of evidence rule substantially increases the burden for sustaining a motion for summary judgment. Under the scintilla of evidence rule, no summary judgment can be granted if a scintilla of evidence exists to support the non-movant's position. Missildine v. Avondale Mills, Inc., 415 So.2d 1040
(Ala. 1981); Browning v. Birmingham News, 348 So.2d 455 (Ala. 1977). The scintilla of evidence rule provides that there need be only a gleam, glimmer, spark, the least bit, or the smallest trace of evidence in support of the non-moving party. Watkinsv. St. Paul Fire and Marine Insurance Co., 376 So.2d 660 (Ala. 1979).
Applying the law to the facts of this case, appellees contend that several grounds exist to bar appellant from recovery and thus make the granting of summary judgment appropriate. The affidavits submitted by Ross-Clayton in support of summary judgment relate to the contention that Lacy King was not an employee or servant of the funeral home or Alabama Cemetery Association, but was instead an independent contractor. Yet, the depositions of Brenda Payne and Laura Mae Payne were sufficient to show at least a scintilla of evidence to the contrary. Both Brenda and Laura Mae stated that Ross-Clayton told them that they would take care of all the funeral arrangements, even after they had requested Fletcher Haynes as their vault man. They both stated that all moneys paid for the funeral were paid directly to Ross-Clayton. Laura Mae testified that when she first saw Lacy King and his sons at the cemetery, he told her, "[W]e do work for Ross and Clayton" and he said that he had been sent by Ross-Clayton to do the vault work. Both parties also testified that Lacy King requested that they not mention to Ross-Clayton the fact that he had opened Emma Lee's casket.
The fundamental test of whether a laborer is an employee or an independent contractor is whether there is a reserved right of control rather than the actual exercise of that right. Whether the laborer in question is an employee or an independent contractor depends on the facts of each particular case, thus making it impossible to state an absolute rule.Hodges Co. v. Albrecht, 288 Ala. 281, 259 So.2d 829 (1972);Solmica of the Gulf Coast, Inc. v. Braggs, 285 Ala. 396,232 So.2d 638 (1970); W.P. Brown Sons Lumber Co. v. Crossley,230 Ala. 403, 161 So. 536 (1935). A review of the facts makes it evident that sufficient evidence existed to defeat a motion for summary judgment based upon the independent contractor/agency issue.
Plaintiff's action is grounded upon the legal rights vested in the next of kin to maintain an action for unwarranted interference with a buried body. We hold that such an action may be grounded in a non-trespass tort as well as in trespass. The plaintiff, being the nearest relative present, is a proper party to bring the action in tort, irrespective of any other possible theory of recovery. Southern Life Health Ins. Co. v.Morgan, 21 Ala. App. 5, 105 So.2d 161, cert. denied, 213 Ala. 413,105 So. 168 (1925). Appellees allege, as another ground for affirmance, however, that appellant's non-trespass claim is barred by the applicable *Page 1072 
one year statute of limitations. Code 1975 provides in pertinent part:
"(a) The following must be commenced within one year:
. . . .
 "(5) Actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section; and
. . . .
 "(7) All actions commenced to recover damages for injury to the person or property of another wherein a principal or master is sought to be held liable for the act or conduct of his agent, servant or employee under the doctrine of respondent superior."
Code 1975, § 6-2-39. Code 1975 further provides:
 "All civil actions must be commenced after the cause of action has accrued within the period prescribed in this article and not afterwards, unless otherwise specifically provided for in this Code."
Code 1975, § 6-2-30. Appellees contend that since the one-year statute of limitations period begins to run after the cause of action has accrued, and since the bodily remains and casket of Emma Lee apparently disappeared in 1975, this action, brought in January 1980, is barred by the statute and thus the granting of summary judgment was proper. Appellant, however, contends that the statute of limitations should not have begun to run until May 13, 1979, when she first discovered the coffin and bodily remains of her mother to be missing.
The time when the statute of limitations begins to run was analyzed thoroughly by this Court in Garrett v. Raytheon Co.,368 So.2d 516 (Ala. 1979). In that case it was stated that the statute of limitations begins to run in favor of the party liable from the time the cause of action accrues, and the cause of action accrues as soon as the party in whose favor it arises is entitled to maintain an action thereon. 368 So.2d at 518. The plaintiff's ignorance of a tort or injury does not postpone the running of the statute of limitations until that tort is discovered. Kelly v. Shropshire, 199 Ala. 602, 75 So. 291
(1917).
The statute, however, will not begin to run until some injury occurs which gives rise to a maintainable cause of action.Garrett v. Raytheon Co., 368 So.2d 516 (Ala. 1979); Corona CoalCo. v. Hendon, 213 Ala. 323, 104 So. 799 (1925); West PrattCoal Co. v. Dorman, 161 Ala. 389, 49 So. 849 (1909). As pointed out in Garrett v. Raytheon Co., the basic principles set forth by Corona Coal and West Pratt Coal on one hand, and Garrett v.Raytheon Co. on the other, are the same. In actions such as the case at bar, the act complained of does not itself inflict a legal injury at the time it is done, but plaintiff's injury only follows as a result and a subsequent development of the defendant's act. "In such cases, the cause of action `accrues,' and the statute of limitation begins to run, `when and only when, the damages are sustained.'" Garrett v. Raytheon Co., 368 So.2d at 519. See also, Kelly v. Shropshire, 199 Ala. 602,75 So. 291 (1917).
Here, it was discovered in 1979 that the grave supposedly containing Emma Lee and Alzada Payne was sinking. It was then discovered that the bodily remains of Emma Lee were missing. At that particular point the plaintiff's injuries accrued, as she had nothing of which to complain until the discovery of the missing body and casket. This stands in contrast to an injury of the type found in Garrett v. Raytheon Co., where the progressive nature of the injury has not made itself manifest at the time of the last exposure. In cases of that nature, the statute of limitations begins to run whether or not the full amount of damages is apparent at the time of the first legal injury. Garrett v. Raytheon Co., 368 So.2d 516 (Ala. 1979);Home Insurance Co. v. Stuart-McCorkle, Inc., 291 Ala. 601,285 So.2d 468 (1973). We therefore hold that the statute of limitations did not begin to run until May 13, 1979, when it was discovered that the bodily remains and casket of Emma Lee were missing and the injury to the plaintiff actually occurred.
Appellee Arthur King contends that summary judgment was proper as to *Page 1073 
him because a son cannot be responsible for the acts of his father. Although he vehemently denies being present at the time Lacy King opened the grave of Emma Lee in 1975, Laura Mae testified that she saw him at the cemetery with Lacy King and that Arthur was said to be helping him at that time. Both Brenda and Laura Mae testified that Lacy King informed them, upon arrival at their house, that he had lowered Emma Lee back into her vault and had turned everything over to his son Arthur to finish. This would undoubtedly make Arthur a proper party to the suit and raise a scintilla of evidence to prevent summary judgment.
Arthur King also contends that the one-year statute of limitations has run as to him, by virtue of the fact that he was substituted as a party defendant for one of the fictitious parties after the one-year statute had run. King states that appellant discovered that Emma Lee's bodily remains and casket were missing on May 13, 1979, but that he was not added as a party defendant until December 18, 1980. Appellee contends that the plaintiff knew his identity at the time the suit was filed and that under the rule of Hinton v. Hobbs, 349 So.2d 28 (Ala. 1977), such amendments to the pleadings will not be allowed to relate back pursuant to Rule 9 (h), ARCP. There is no evidence, however, that Arthur King raised this issue at the trial level and he will not be allowed to add this new theory on appeal.Engel Mortgage Co. v. Triple K Lumber Co., 56 Ala. App. 337,321 So.2d 679 (1975).
Since we hold that appellant may maintain a non-trespass tort action for the unwarranted interference with a buried body, we need not reach appellee's contention that Brenda Payne could not bring an action in trespass since she did not own the quasi-property rights in Emma Lee's burial plot. It being clear that there do exist genuine issues as to material facts, and that the claims were not time-barred, it was error to grant summary judgment. Accordingly, the decision of the trial court is due to be reversed.
REVERSED AND REMANDED.
MADDOX, JONES, SHORES and BEATTY, JJ., concur.
[1] Brenda testified that since her aunt, Laura Mae, had raised her from childhood, she often referred to Laura Mae as her mother instead of her aunt.