633 A.2d 466

Dorothy Mae WALSER, et al.

v.

RESTHAVEN MEMORIAL GARDENS, INC., et al.

No. 181, Sept. Term, 1993.

Court of Special Appeals of Maryland.

Dec. 2, 1993.

374

376

G. Randall Whittenberger (Miles & Stockbridge, on the brief), Frederick, for appellants.

M. Brooke Murdock (Robert L. Ferguson, Jr. and Thieblot, Ryan, Martin & Ferguson, on the brief for appellee, Babylon), Baltimore, James H. Scott (Stern & Kresslein, on the brief for appellees, Resthaven and Cody), Frederick, Paul M. Finamore (Larry J. Albert and Niles, Barton & Wilmer, on the brief for appellee, Sally Walser), Baltimore, for appellees.

Argued before WILNER, C.J., and FISCHER and MOTZ, JJ.

WILNER, Chief Judge.

Appellants are aggrieved by an order of the Circuit Court for Frederick County dismissing their multi-count complaint against Sally Walser, Resthaven Memorial Gardens, Inc., Richard Cody, and Babylon Vault Company. The complaint arose from what appellants regard as the wrongful disinterment of Billy J. Walser, the son of appellant Dorothy Mae Walser and the brother of the other appellants.

## I.  *Underlying Facts*

Dorothy Mae and Billy F. Walser (Billy F.) were once married. That union produced four children—Billy J. Walser (Billy J.) and the three other appellants. Eventually, Dorothy Mae and Billy F. divorced; Dorothy Mae moved to North Carolina and Billy J. remained in Maryland with his father. The other three children, it appears, also remained in, or returned to, Maryland. Billy F. later married Sally and, by her, had another son, Chris Walser. At some point before

1981, Billy F. and Sally purchased a burial plot at the Resthaven cemetery. The plot contained four adjacent spaces.

In 1981, Billy J., then in his 20's, was killed and was buried in space number 3. Billy F. was the next to die, although when is not clear from the record before us. He was buried in space number 1. In 1991, Chris died and was buried in space number 4, leaving space number 2 reserved for Sally. Not long after Chris's death, Sally decided that she wanted to be buried next to her natural son, Chris, and therefore requested Resthaven to have the remains of Billy J. and Chris, who were buried next to each other, switched. Upon that request, Resthaven prepared two Disinterment Agreements, under which it agreed to arrange for the switch. In those agreements, Sally (1) asserted that she was, or represented, all of the next of kin of Billy J. and Chris, (2) requested the disinterment of those two persons, and (3) also requested Babylon Vault Company to furnish the necessary personnel and equipment to accomplish the disinterments. She agreed to hold Resthaven harmless with respect to any claims or damage arising from any action taken by Resthaven and also appointed Resthaven as her agent to procure all permits required by law to complete the disinterment.

Pursuant to an agreement with Resthaven and after obtaining the disinterment agreements, Babylon completed the switch in October, 1991. It removed Chris's casket from space number 4, slid Billy J.'s casket from space number 3 into space number 4 without actually removing it from the ground, and then replaced Chris's casket in space number 3. Following that operation, the two headstones were switched. When, at some later point, appellants visited Billy J.'s gravesite, they discovered the switch and filed this lawsuit. They had not been previously notified of the contemplated, or actual, disinterment of Billy J.

The complaint contained 13 counts, as follows: Count I (Gross Negligence); Count II (Negligence); Count III (Intentional Infliction of Emotional Distress); Count IV (Wrongful Disinterment); Count V (Trover); Count VI (Trespass); Count VII (Constructive Fraud); Count VIII (Fraudulent

Concealment); Count IX (Breach of Confidence); Count X (Public Nuisance); Count XI (Invasion of Privacy); Count XII (Conspiracy); and Count XIII (Injunction). The court dismissed the first 12 counts as failing to state claims upon which relief could be granted. The parties then stipulated to injunctive relief, whereupon this appeal was filed. Appellants contend that the court erred in dismissing each of the 12 counts. Although not clearly stated therein, the gravamen of their complaint seems to be that, in arranging for and carrying out the disinterment of Billy J., the appellees never contacted them or obtained their approval and never obtained prior authorization from the State's Attorney for Frederick County. Approval of the State's Attorney, they say, is required by Md.Code art. 27, § 265; their approval is required both by that statute and by common law.

## II. *Motion To Dismiss*

[1] Before proceeding to discuss the merits of appellants' complaint, we need to consider Sally's motion to dismiss the appeal. That motion is based on the fact that, in dismissing Counts I through XII, the court stated, in the concluding sentence of its amended order, that "[t]he Plaintiffs shall have thirty days from the date of this Order to file for leave to amend the Complaint." Sally treats this statement as though it granted leave to amend, thereby making the order non-appealable. That is not, however, the case.

Md.Rule 2–322(c), dealing with motions to dismiss a complaint, provides, in relevant part, that:

"If the court orders dismissal, an amended complaint may be filed *only if the court expressly grants leave to amend.* The amended complaint shall be filed within 30 days after entry of the order or within such other time as the court may fix. If leave to amend *is granted* and the plaintiff fails to file an amended complaint within the time prescribed, the court, on motion, may enter an order dismissing the action."

(Emphasis added).

In conformity with this Rule, the Court of Appeals has held on a number of occasions that, where an order dismissing a

complaint or granting summary judgment expressly grants leave to file an amended complaint, that order is not immediately appealable. *See Makovi v. Sherwin–Williams Co.*, 311 Md. 278, 533 A.2d 1303 (1987); *National Glass v. J.C. Penney*, 329 Md. 300, 619 A.2d 528 (1993). Unlike those situations (in *Makovi*, for example, the order stated that "[t]he plaintiff is granted thirty (30) days in which to file an amended complaint"), no such leave was granted by the order here. Indeed, the court was careful to reserve judgment on whether it would allow an amended complaint to be filed, stating only that the plaintiff had 30 days to file "for leave to amend the Complaint." Had appellants filed an amended complaint without obtaining such leave, it would have been a nullity, for the Rule very clearly states that an amended complaint may be filed "only if the court expressly grants leave to amend."

Why the court included the language that it did is not clear. Perhaps it wanted to see what kind of amended complaint would be offered before deciding whether to allow it. Whatever may have been the court's reason, it is evident that leave was not expressly given, and so the amended order entered on January 7, 1992, was final and appealable. The motion to dismiss is denied.

### III. *Sufficiency Of The Complaint*

#### A. Introduction

In Counts I and II, appellants allege that appellees owed them a duty of care, which was breached by their actions. They do not state, however, what that duty of care was or how it was breached. In some of the introductory paragraphs in the complaint, appellants aver that the disinterment of Billy J. was arranged and carried out without appellants' permission or approval, but it is not until Count VIII, charging fraudulent concealment, that we find an allegation that appellees "were under a duty to disclose their anticipated actions prior to undertaking them, so that authorization could be sought and a decision could properly be made" and that "[n]o authorization or permission was sought nor obtained from Plaintiffs."

In their response to appellee Babylon's motion to dismiss, appellants, for the first time, made clear that the duty underlying the action in general was to request their permission for the disinterment of Billy J. and that it was breached by appellees' failure to ascertain appellants' whereabouts and obtain that permission. They argued to the circuit court, and argue to us, that that duty emanates both from the common law and from Md.Code art. 27, § 265.

In examining the sufficiency of the 12 counts at issue, we shall assume that each rests on the assertion that appellees had a duty to inform the appellants of their anticipated removal of Billy J. from his grave and to obtain their permission, and that appellees' failure to satisfy that obligation is what gives rise to the various causes of action pled. We note, in that regard, that although there is an allegation that Sally was aware of appellants' whereabouts, there is no such allegation with respect to the other appellees. There is no averment that those appellees knew, or should have known, that Sally was not the sole next-of-kin of Billy J. and Chris, as she represented.

## B.  General Discussion—Common Law

The underpinnings and development of the common law of sepulture are well set out in Annotation, *Removal and [R]einterment of [R]emains*, 21 A.L.R.2d 472 (1952). Further expositions of that law, in some of its more particular manifestations, are examined in later A.L.R. annotations. *See Civil Liability of Undertaker in Connection with Transportation, Burial, or Safeguarding of Body*, 53 A.L.R.4th 360 (1987); *Disinterment in Criminal Cases*, 63 A.L.R.3d 1294 (1975); *Liability for Desecration of Graves and Tombstones*, 77 A.L.R.4th 108 (1990). At least three broad principles emerge from these works: (1) the normal treatment of a corpse, once it is decently buried, is to let it lie (21 A.L.R.2d at 476); (2) respectful disinterments have been looked upon as private concerns of the deceased's family and the cemetery, if they all agree (21 A.L.R.2d at 481); and (3) if there is any disagreement among the family or the cemetery as to any contemplat-

ed or completed disinterment, relief can be afforded, in certain circumstances, in either equity or law, depending on the nature of the controversy (21 A.L.R.2d at 483–84).

The first two of these principles and the ability of equity to resolve disputes as to contemplated disinterments have clearly been recognized in Maryland. In *Dougherty v. Merc.–Safe Dep. & Tr.*, 282 Md. 617, 387 A.2d 244 (1978), a widow (Elizabeth) petitioned to remove the body of her deceased husband for reburial elsewhere. The disinterment was sought initially because the owner of the plot—Elizabeth's father-in-law—had breached an agreement to reserve the adjacent space for her by burying his daughter Geraldine (Elizabeth's sister-in-law) in that space, but by the time the case went to court that problem had been resolved. The father-in-law had died, and his family had agreed to remove Geraldine to another space so that Elizabeth could be buried next to her husband.

In affirming the denial of Elizabeth's petition, the Court first observed that, while "there is no property in a dead body in a commercial or material sense," a surviving spouse did have a temporary right to the possession of his or her deceased spouse's body for the purpose of burial. The Court further held, however, that "when the duty to furnish proper burial has been discharged, the right of custody ceases and the body is thereafter in the custody of the law and disinterment or disturbance of the body is subject to the control of a court of equity." 282 Md. at 620, 387 A.2d 244. Quoting in part then from a New York case, the Court concluded, at 620–21, 387 A.2d 244, that:

" 'The dead are to rest where they have been laid unless reason of substance is brought forward for disturbing their repose.'

Thus, any right of the wife to remove the body after it is interred is conditioned upon her having a sound reason. There have been instances when the courts have granted permission, *e.g.*, when the initial interment was understood to be temporary ... or where there is a lack of room for the

spouse to be buried beside the deceased ... or the body is wrongfully interred in the lot of a plot owner....

*However, where an interment takes place with the consent, express or implied, of those most interested, the interment is regarded in law as a final sepulture.* ... This is particularly of great weight where the surviving spouse consents to the initial place of burial ... unless the spouse can show that the consent was obtained through coercion or was otherwise involuntary."

(Emphasis added; citations omitted.)

*Dougherty* was a case seeking prospective equitable relief. The 21 A.L.R.2d annotation points out that legal relief is also available to protect the right of repose. In this latter regard, it notes that:

"Equity's exclusive jurisdiction is confined to disinterments and removals (and restorations) in prospect. In most states where the question has arisen a survivor who qualifies as a proper party plaintiff can maintain his action at law to recover damages for an accomplished wrongful exhumation and removal (and for a wrongful exhumation without removal). Although there is much confusion in the reasons advanced by the courts, actually, it seems a new tort has been created. The desire of survivors to have the remains of their decedents lie undisturbed has come to be recognized as worthy of legal protection; and the acute emotional suffering following invasion of the desire as deserving of compensatory or punitive damages."

21 A.L.R.2d at 484; *see also* 77 A.L.R.4th at 117.

In further recognition of this principle, *Restatement (Second) of Torts,* § 868 states:

"One who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body."

This section of the *Restatement* covers conduct well beyond the wrongful disinterment of properly buried corpses, and

indeed the principle embodied in it is most frequently applied in two other types of cases: those involving conduct occurring prior to burial—mostly unauthorized or negligently performed autopsies or the improper preparation of the body by morticians or others; and those arising from wrongful burials, including negligence in conducting burials or in the manner of interment. The *Restatement* recognizes, however, that the principle applies as well to wrongful disinterments. The section imposes liability on one who wrongfully "removes" a dead body, and Comment e to the section states that " 'Removes' includes disinterment."

The basis of this liability is described in Comment a to the *Restatement* section. In conformance with the A.L.R. approach, the American Law Institute there notes that, although the "technical basis" of the cause of action is an interference with the exclusive right of control of the body, which is frequently characterized as a "property" right, in practice that technical right "has served as a mere peg upon which to hang damages for the mental distress inflicted upon the survivor; and in reality the cause of action has been exclusively one for the mental distress."

■  The kind of civil liability noted in the A.L.R. annotations and in § 868 of the *Restatement*, which to date has not been considered in Maryland, attempts to give recognition to the principles enunciated in *Dougherty*. If, indeed, there is a legally cognizable right to have the bodies of deceased next-of-kin remain undisturbed, a right enforceable prospectively in equity, there must, of necessity, be a corresponding duty on the part of others not to interfere with that right without some special, legally cognizable, justification. We think it clear, therefore, as a natural extension of *Dougherty*, that civil liability does exist on the part of persons who, without the consent of those who have a say in the matter, disinter properly buried bodies. The questions that arise are (1) what is the precise basis and nature of this liability, and (2) to whom does it flow?

With respect to the first question, some courts, as the A.L.R. annotation indicates, view wrongful disinterment as an independent tort.[1] Other courts treat such conduct as a form of general negligence, negligent infliction of emotional distress (where that is regarded as a separate tort), or intentional infliction of emotional distress, depending on the circumstances.[2] We are inclined toward the second view.

There is no need to create an independent tort. If we accept that there is a right not to have the bodies of deceased next-of-kin disturbed and a concomitant duty to respect that right, and we further recognize that a breach of that duty can cause significant emotional distress and possibly physical injury as well, the existing causes of action for negligence and intentional infliction of emotional distress suffice. As we indicated in *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 63, 502 A.2d 1057 (1986) in rejecting an invitation to recognize negligent infliction of emotional distress as a separate tort, "[r]ecovery may be had in a tort action for emotional distress arising out of negligent conduct. In such case, the emotional distress is an element of damage, not an independent tort." With respect to intentional conduct, the Court of Appeals has recognized the more general tort of intentional infliction of emotional distress, *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977), and so there is no reason to

---

1. *See Payne v. Alabama Cemetery Ass'n, Inc.,* 413 So.2d 1067 (Ala.1982); *Tomasits v. Cochise Memory Gardens, Inc.,* 150 Ariz. 39, 721 P.2d 1166 (1986); *Spomer v. City of Grand Junction,* 144 Colo. 207, 355 P.2d 960 (1960); *Jacobus v. Congregation of Children of Israel,* 107 Ga. 518, 33 S.E. 853 (1899); *Hamilton v. Individual Mausoleum Co.,* 149 Kan. 216, 86 P.2d 501 (1939); *Louisville Cemetery Ass'n v. Downs,* 241 Ky. 773, 45 S.W.2d 5 (1932); *Resthaven Memorial Cemetery v. Volk,* 286 Ky. 291, 150 S.W.2d 908 (1941); *City of Hopkinsville v. Burchett,* 254 S.W.2d 333 (Ky.1953); *Burton v. City of New Orleans,* 464 So.2d 943 (La.Ct. App.1985); *Gostkowski v. Roman Catholic Church,* 262 N.Y. 320, 186 N.E. 798 (1933); *Hovis v. City of Burns,* 243 Or. 607, 415 P.2d 29 (1966); *Nixon v. Collins,* 421 S.W.2d 682 (Tex.Civ.App.1967); *Flores v. De Galvan,* 127 S.W.2d 305 (Tex.Civ.App.1939); *Classen v. Benfer,* 144 S.W.2d 633 (Tex.Civ.App.1940).

2. *See Carney v. Knollwood Cemetery Ass'n,* 33 Ohio App.3d 31, 514 N.E.2d 430 (1986); *Sanford v. Ware,* 191 Va. 43, 60 S.E.2d 10 (1950).

create a separate tort for conduct which would seem clearly to fall within the existing one.

We turn, then, to the question of who may recover: to whom does the duty we have recognized flow? The *Restatement* speaks in terms of "a member of the family who is entitled to the disposition of the body." That would seem, on its face, to have more direct relevance to cases involving pre-burial misconduct than to cases arising from disinterments, but, as the section draws no distinction, it serves to limit the potential disinterment plaintiffs as well to only the immediate next-of-kin. In this regard, the American Law Institute observes in Comment g to § 868:

> "The decisions in which recovery has been allowed for interference with a dead body have thus far been those in which the plaintiff has been the person entitled to disposition of the body or one of a group, such as children of the deceased, who have equal right of disposition. In the absence of decisions, the Institute expresses no opinion on whether one who is not entitled to the disposition may not, under some circumstances, have a cause of action for his own mental distress under the principle stated in this Section."

Ordinarily, it is only this small group of persons who have the right of possession for the purpose of burial. *Cf. Dougherty, supra,* 282 Md. 617, 387 A.2d 244. The case law, by and large, is consistent with that limitation. Courts have permitted recovery, for wrongful disinterment, by a spouse of the decedent,[3] and, where there is no spouse, some courts have allowed recovery by a parent or child of the decedent.[4] One

---

3. *See, e.g., Resthaven Memorial Cemetery v. Volk, supra,* 150 S.W.2d at 910; *Gostkowski v. Roman Catholic Church, supra,* 186 N.E. at 800; *Hovis v. City of Burns, supra,* 415 P.2d at 31–32; *Flores v. De Galvan, supra,* 127 S.W.2d at 307; *Sanford v. Ware, supra,* 60 S.E.2d at 12.

4. The most common eligible plaintiff is either a surviving parent, *see Louisville Cemetery Ass'n v. Downs, supra,* 45 S.W.2d at 6; *Spomer v. City of Grand Junction, supra,* 355 P.2d at 962; *Burton v. City of New Orleans, supra,* 464 So.2d at 944, or a surviving child. *See City of*

court allowed recovery by a grandchild when there was no spouse or closer relative able to press the claim.[5] As a general rule, however, the cases have tended to follow the *Restatement* approach of limiting recovery to those immediate next-of-kin who, prior to burial, would have been entitled to possession of the body for purposes of burial, even if they do not express the limitation in those terms. It is a very limited class, which narrows even more when the dispute is between or among persons who might otherwise fall within it.

As Billy J.'s mother, Dorothy Mae would normally fall within the limited class, at least if there were no one else of equal or superior rank within that class. This is a matter we shall consider further in Part F.

### C. Statutory Duty

We turn now to the second basis of liability asserted by appellants—Md.Code art. 27, § 265. That statute, first enacted in 1882, provides as follows:

"Every person, his aiders, abettors and counsellors, who shall be convicted of removing or attempting to remove from any graveyard, burial ground or vault in the State of Maryland any dead body which shall have been buried in such graveyard, burial ground or vault, shall be deemed guilty of a misdemeanor, and shall be sentenced to the penitentiary for not less than five nor more than fifteen years, unless such person or persons shall have been authorized by the State's Attorney for Baltimore City or for the county in which such graveyard, burial ground or vault may be situated to remove such dead body for the purpose of

*Hopkinsville v. Burchett, supra,* 254 S.W.2d at 333–34; *Nixon v. Collins, supra,* 421 S.W.2d at 685; *Carney v. Knollwood Cemetery Ass'n, supra,* 514 N.E.2d at 433–36; *Hamilton v. Individual Mausoleum Co., supra,* 86 P.2d at 503–04; *Tomasits v. Cochise Memory Gardens, Inc., supra,* 721 P.2d at 1168; *Payne v. Alabama Cemetery Ass'n, Inc., supra,* 413 So.2d at 1071; *Burton v. City of New Orleans, supra,* 464 So.2d at 944; *Jacobus v. Congregation of Children of Israel, supra,* 33 S.E. at 854–55.

**5.** *See Carney v. Knollwood Cemetery Ass'n, supra,* 514 N.E.2d at 433–36.

ascertaining the cause of death of the person whose body is so removed, or for the purpose of reburial."

■ Appellants rely on the "unless" clause as establishing a duty on the part of anyone seeking to disinter a body to obtain authorization from the State's Attorney. That duty, they suggest, runs to their benefit. The argument is that, had appellees sought authorization from the State's Attorney, he would have conducted some kind of investigation, that as a result, he would have discovered appellants' whereabouts and interest, and that he would have denied authorization absent consent by appellants. We find no merit to the argument.

Section 265 is a criminal statute. There is scant relevant legislative history with respect to it, but it appears to be a more or less typical grave-robbing statute similar to those enacted in other States in the latter part of the 19th Century. Its formal interpretation has been confined to two Opinions of the Attorney General.

In the first of those Opinions, 39 Op.Atty.Gen. 179 (1954), the Attorney General concluded that the statute had been implicitly repealed by the enactment in 1898 of what is now Md.Code Health–Gen. art., § 4–215. That statute deals generally with the transportation, burial, and disinterment of dead bodies. It requires a burial-transit permit from the Department of Health and Mental Hygiene in order to transport a body within the State for burial and requires as well a permit for disinterment and reinterment "if reinterment is not to be made in the same cemetery." The Attorney General determined that there was an inconsistency between the two statutes "inasmuch as they require the issuance of a permit from two different sources in order to authorize the performance of the same act" and that, in an uncodified section of the later Act, all inconsistent statutes were repealed. The end conclusion of the 1954 Opinion was that authorization by the State's Attorney was not required for disinterment. The only permit needed was one from the Health Department, and that was required only if reinterment was not to be made in the same cemetery.

In January, 1991, the Attorney General decided that the 1954 Opinion was in error and that, unless disinterment is authorized by a court order, permission from the State's Attorney must be obtained. 76 Op.Atty.Gen. 27 (1991). In this second Opinion, the Attorney General relied on the strong presumption against repeals by implication and observed that, while a dual permit requirement may not be "the tidiest regulatory system," the General Assembly may have had some purpose for requiring notice to and approval of both agencies. In this regard, he observed:

"On the one hand, the State's Attorney's authorization puts law enforcement officials on notice so that they do not treat certain disinterments as a crime. Assuming that the State's Attorney detects no wrongdoing, the approval would be granted as a matter of course. On the other hand, [the Department of Health and Mental Hygiene] must be made aware of disinterments because one of its ministerial functions is to record the location of dead bodies. In short, any 'conflict' between the statutes is more one of possible inconvenience than irreconcilability or mutual repugnance."

This second Opinion, which effectively resuscitated § 265 after a 37–year dormancy, was issued about nine months before the disinterment of Billy J.

■ Appellees do not take issue with the current conclusion of the Attorney General that § 265 is, and was at the time of the disinterment, in full force and effect. We therefore shall assume that to be so and turn our attention to its relevance to this case. It is, as we have said, a criminal statute, making disinterments occurring without authorization of the State's Attorney a misdemeanor. The law generally is that "[t]he violation of a statute may furnish evidence of negligence … but only where the person alleging negligence is within the class of persons sought to be protected, and the harm suffered is of the kind which the statute was intended, in general, to prevent." *Atlantic Mutual v. Kenney,* 323 Md. 116, 124, 591 A.2d 507 (1991).

Given the paucity of recorded legislative history regarding § 265, we can only speculate as to what, precisely, the Legislature had in mind when it allowed the State's Attorney, in effect, to exempt people from what otherwise would be criminal conduct. In the absence of any better explanation, we accept the Attorney General's suggestion that it was probably to alert law enforcement officials that the disinterment was for a valid purpose—to ascertain the cause of death "or for the purpose of reburial"—and not for any more nefarious or objectionable purpose. We accept as well the notion that, once the State's Attorney is satisfied that the disinterment is for one of those two purposes, authorization would be granted as a matter of course, there being no reason to withhold it.

█ Upon this analysis, we do not believe that § 265 confers any rights upon appellants under the circumstances of this case. The sole purpose for the disinterment of Billy J. was for reburial; once that purpose was established—and there is no dispute as to it—there would be no reason for the State's Attorney to deny authorization. The State's Attorney's focus is a narrow one; it is not his or her responsibility to enforce whatever civil right a next-of-kin may have in precluding a disinterment or to act as an arbiter of disputes between family members. The violation of the statute was really a technical one—not obtaining in advance an authorization that likely would not have been denied—and we do not believe it can serve as the basis for a cause of action by appellants.[6] They are not "within the class of persons sought to be protected" by the statute.

We conclude, therefore, that any duty on the part of appellees to notify appellants and obtain their prior approval to a

---

**6.** We note that there is no averment in the complaint that the State's Attorney would have denied authorization had it been sought prior to the disinterment. We were informed at oral argument, as was the circuit court at the hearing on appellees' motion to dismiss, that the State's Attorney was informed after the disinterment occurred and this controversy arose and that he decided to take no action against appellees.

disinterment of Billy J. arises solely under the common law, and it is the application of that law that we shall now consider.

### D. Appellees Other Than Sally Walser

As we observed, each of the 12 counts at issue is based on the premise that the appellees owed a duty to appellants to inform them in advance of the contemplated disinterment and obtain their consent, which, it seems fair to assume, would have been denied. The complaint avers that, by signing the disinterment agreements, Sally represented to the other appellees that she was, or represented, the sole next-of-kin of both Billy J. and Chris, and, as we also noted, there is no allegation that any of those other appellees had any reason to suspect that Sally's representation was not true. There is no assertion that any of those appellees knew, or should have known, of appellants' existence, much less of any relationship they might have to either Billy J. or Chris. The plot was purchased by Billy F. and Sally. They had buried Billy J., and Sally had buried Billy F. and Chris. Under these circumstances, we fail to see how any of those appellees could possibly have owed, or breached, any common law duty to appellants. Judgment was properly entered in their favor.

### E. Liability to Siblings

As we have already explained, the class of persons protected by the principle enunciated in *Restatement* § 868 is limited to those "entitled to the disposition of the body," and, while facially, Dorothy Mae might fall within that class, her children would not *also* be within it. So long as Dorothy Mae was alive, she alone formed the protected class. We therefore affirm the judgments entered against Billy J.'s siblings. They had no independent right to advance notice and no right to preclude Sally from proceeding with the disinterment.

### F. Liability of Sally to Dorothy Mae

Having defined the nature and scope of the tort and the class of persons protected, thereby winnowing the case down

to Dorothy Mae and Sally, we turn, finally, to the sufficiency of the allegations in the complaint.

We have examined the 12 counts at issue and find each of them technically deficient in one way or another, each defect sufficient in its own right to warrant dismissal. We shall catalog these deficiencies shortly. There is, however, in addition, a more basic deficiency.

As we observed, the entire complaint rests on the underlying premise that Sally was under a legal obligation to consult with Dorothy Mae and obtain her consent before proceeding to move Billy J.'s body. We have earlier concluded that, as Billy J.'s mother, Dorothy Mae would normally fall within the limited class of persons entitled to select the place and method of burial. Here, however, we believe that is not the case.

At the time of his death, Billy J. was living with his father and Sally. It is not clear from the complaint how long Sally and Billy F. had been married, but it is fairly inferable that the two of them constituted Billy J.'s nuclear family. In ¶ 7 of the complaint, Dorothy Mae alleges that the child's resting place was determined by Billy F. "along with other family members." She does not state who those "other family members" were. More pointedly, she neither avers that Sally was not among that group or that she (Dorothy Mae) was. In short, there is nothing in the complaint to indicate that Dorothy Mae played any role in the initial interment or that she would have been entitled to possession of Billy J.'s body for the purpose of burial. Indeed, the relevant averments suggest precisely the contrary.

Inclusion within the protected class is a precondition to the right of recovery, for absent that inclusion no duty to consult is imposed. It is therefore an element necessary to be pled and proved. By omitting to plead that averment, Dorothy Mae has failed to state a cause of action.

That omission is itself fatal. There are, as we have indicated, other mortal deficiencies in each of the 12 counts, which we shall now briefly describe.

*Counts I and II—Negligence and Gross Negligence*

Count I asserts gross negligence; Count II claims simple negligence. As we indicated, in neither count does Dorothy Mae allege the nature of the duty owed by Sally, although, from subsequent papers filed, the court was clearly aware that the claimed duty was to inform Dorothy Mae and obtain her approval, and it acted on that basis in dismissing those two counts.

■ We note that, in the introductory paragraphs of the complaint, Dorothy Mae alleged that Sally knew that Dorothy Mae was living in North Carolina and knew as well that her children were living in the local community of Frederick, Maryland, that she *"consciously* decided not to discuss her plans or request permission for authorization" prior to proceeding with the disinterment (¶ 13, emphasis added), that Sally had shown "resentment and hatred" toward Dorothy Mae (¶ 20), that all of her conduct was "intentional, reckless, and in deliberate disregard of a high degree of probability that emotional distress would result" and that it was also *"malicious,* willful, and intentional." (¶ 21, emphasis added.) These preliminary averments were incorporated by reference into each of the 12 counts at issue, and thus became part of the claims for gross and simple negligence. In Count I, Dorothy Mae repeated that Sally's conduct was wanton, reckless, extraordinary, and outrageous, and that it was in *conscious disregard* of the fact that, once taken, her actions could not be cured and would permanently affect Dorothy Mae. Those averments too were incorporated by reference into Count II.

■ It is evident that Dorothy Mae has pleaded intentional conduct, not negligent conduct. As a general proposition, "[i]f the tortious act is intentional, it may be willful, wanton, or fraudulent, but not negligent." *Adams v. Carey,* 172 Md. 173, 186, 190 A. 815 (1937), quoted in *Campfield v. Crowther,* 252 Md. 88, 95, 249 A.2d 168 (1969). Although an act committed intentionally may give rise to an action in negligence if one or more of the harmful consequences of that

act are unintended (*see McCance v. Lindau,* 63 Md.App. 504, 492 A.2d 1352 (1985); *Ghassemieh v. Schafer,* 52 Md.App. 31, 447 A.2d 84 (1982), *cert. denied,* 294 Md. 543), the complaint here avers that both the act and the consequences were intended. That is the essence of a claim of malicious conduct—conduct in *"conscious,"* rather than negligent or even reckless, disregard of the effect on Dorothy Mae. By loading Counts I and II with such allegations, Dorothy Mae has failed to plead an action for negligence or even gross negligence.

*Count III—Intentional Infliction of Emotional Distress*

An action for intentional infliction of emotional distress arises when (1) the conduct is intentional or reckless, (2) it is extreme and outrageous, (3) there is a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress is severe. *Batson v. Shiflett,* 325 Md. 684, 602 A.2d 1191 (1992); *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977).

The particular deficiency here is in the averments as to Sally's motivation. In ¶ 12 of the complaint, which was incorporated into Count III, Dorothy Mae averred that Sally wanted the gravesites switched so that, when she died, she could be buried next to her natural son, Chris. There is no allegation that the movement of Billy J.'s body was for any other purpose; specifically, there is no averment that it was done in order to inflict emotional distress on Dorothy Mae. Although the act of causing the bodies to be switched was intentional, the infliction of emotional distress upon Dorothy Mae was not; it was, at best, a by-product, even if an anticipated one, of conduct undertaken for a wholly different purpose. An actor is not liable "where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." *Young v. Hartford Accident & Indemnity,* 303 Md. 182, 197, 492 A.2d 1270 (1985), quoting *Restatement (Second) of Torts* § 46, comment g.

### Count IV—Wrongful Disinterment

We have already concluded that there is no separate tort in Maryland for wrongful disinterment.

### Count V—Trover and Conversion

An action for trover based on a wrongful conversion arises from an "act of ownership and dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Interstate Ins. Co. v. Logan,* 205 Md. 583, 109 A.2d 904 (1954); *Hamilton v. Ford Motor Credit Co., supra,* 66 Md.App. 46, 502 A.2d 1057. The only significant allegation in Count V is that the appellees wrongfully took and interfered with property that was not theirs without permission or justification, exercising dominion over it. Dorothy Mae does not identify the property that is the subject of her allegation, but we assume that she is speaking of Billy J.'s remains. As *Dougherty v. Merc.—Safe Dep. & Tr., supra,* 282 Md. 617, 387 A.2d 244, makes clear, there is no personal property interest in a properly buried dead body, and so Dorothy Mae may not maintain an action for trover based on the disinterment.

### Count VI—Trespass

Trespass requires an invasion of a possessory interest in property. *New Windsor v. Stocksdale,* 95 Md. 196, 52 A. 596 (1902). The only relevant averment in Count VI is that the appellees, without authority or justification, intentionally dispossessed the property interests of the appellants. Once again, the property and property interests are not specified, and so, on that basis alone, the pleading is woefully deficient. For the reasons noted above, Dorothy Mae had no property interest in Billy J.'s remains, and she asserted no property interest in the gravesite.

### Counts VII and IX—Constructive Fraud; Breach of Confidence

In Count VII, Dorothy Mae alleges that Sally had a legal and equitable duty, "arising out of a relationship where

trust and confidence was to exist" which she breached. Dorothy Mae does not explain what the nature of this relationship was or how or why it was one involving trust and confidence. All we are told is that Dorothy Mae was the former wife of Sally's late husband. We fail to see how that creates any legally cognizable relationship between the two women, much less one involving any trust or confidence. Count IX is a legal vacuum. It alleges only that the appellees "owed a duty to Plaintiffs which was breached by [appellees]."

## *Count VIII—Fraudulent Concealment*

■ Count VIII rests on the assertions that Sally was "under a duty to disclose [her] anticipated actions prior to undertaking them, so that authorization could be sought and a decision could properly be made," that no authorization or permission was sought from the appellants, that the failure to disclose material facts important to the appellants was with intent to deceive, that Sally knew that Dorothy Mae "would act in a different manner had [she] known of the existence of the undisclosed facts," and that Dorothy Mae "acted in justifiable reliance on the concealment."

It is evident that Sally made no positive representation whatever to Dorothy Mae. Taking the complaint as a whole, the only possible fraud allegedly practiced by her was in making the false representation to Resthaven that she was, or represented, the sole next-of-kin of Billy J. when she knew, or should have known, that was not so. Implicitly, this was done to induce Resthaven to make the switch without consulting anyone else—specifically, without consulting Dorothy Mae. We have held, however, that Sally was under no obligation to consult with or obtain the approval of Dorothy Mae, and so Count VIII falls on that basis. *See also Orlin v. Torf,* 126 A.D.2d 252, 513 N.Y.S.2d 870, *appeal denied,* 70 N.Y.2d 605, 519 N.Y.S.2d 1029, 513 N.E.2d 1309 (1987), holding, under similar circumstances, that a misrepresentation made to a cemetery to gain its consent to a disinterment did not create a cause of action for fraud in the grandson of the decedent, who, if notified, would have objected.

### Count X—Public Nuisance

Dorothy Mae contends here that the appellees "unreasonably interfered with the rights of the community at large." She does not say how. We can find nothing in the complaint suggesting how the property rights of the public at large have been in any way affected by what occurred.

### Count XI—Invasion of Privacy

Count XI states that the appellees had intentionally intruded upon the "private matters of [plaintiffs'] paying respect to their loved one," which was offensive. We are told nothing else. That does not suffice.

### Count XII—Conspiracy

Dorothy Mae alleges here that the appellees "conspired with one another and amongst themselves, including entering contracts to wrongfully disinter, commit crimes in violation of Maryland law, and to commit the violations, breaches, and wrongs alleged in the previous counts provided within this Complaint." We have concluded, as a matter of law, that no crimes were committed and no civil wrongs were properly alleged. This count therefore falls with the others.

As a parting comment, we note that the principal issues in this case—whether the appellees had an obligation to consult with Dorothy Mae or obtain authorization from the State's Attorney and, if so, what the consequences were of a failure to do so—were legitimate ones of first impression in Maryland. Regrettably, those issues were buried in a clutter of bald, imprecise, and incomplete allegations. Although pleadings are required to be simple, direct, and concise, they must contain "such statements of fact as may be necessary to show the pleader's entitlement to relief." Md.Rule 2–303(b).

JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.