# Wytheville

ISAAC H. GOLDMAN, AND OTHERS v. MEYER MOLLEN, AND OTHERS.

June 10, 1937

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*LeRoy R. Cohen*, Jr., for the appellants.

*Gross & Gross, Isador Shapiro* and *Wilmer L. O'Flaherty*, for the appellees.

HOLT, J., delivered the opinion of the court.

Benjamin Goldman was throughout his life an orthodox Jew and was for many years a member of Sir Moses Montefiori Congregation, a synagogue of that faith. He died in 1922 and was buried in Sir Moses Montefiori Cemetery, his place of burial being in a plot there purchased and paid for by his family. This cemetery is owned and controlled by trustees of their synagogue, who have been in control for more than forty-five years. Mrs. Goldman, his widow, died on September 3, 1934, and in accordance with her wishes was buried in the cemetery of Beth Ahabah Congregation, a house of reformed Jewish worship of which it was an affiliate. Her children then sought to remove their father's body from the cemetery in which he lay that they might place it by the body of their mother. Permission to do this was refused by said trustees, whereupon this suit was brought to compel consent. These trustees answered and evidence upon the issue made was taken in open court. Its chancellor was of opinion that the complainants were not entitled to the relief prayed for and so decreed; hence this appeal.

Frances Idear, a daughter thirty-seven years old when this cause was heard, said that her father was an orthodox Jew and lived in that faith until his death. He came to Richmond in March, 1910, where, associating himself with men of his faith, he joined Sir Moses Montefiori Congregation, but that some years later he and a small group of his associates became dissatisfied and thereafter worshipped in a rented room on West Broad Street. He was a rabbi and as such was charged with and did perform certain of the ritualistic duties imposed upon him by his faith.

This witness was teaching in Harrisonburg when her father died. She came home and found that the funeral arrangements had already been made. They appear to have been made by members of the decedent's synagogue. She did not know who had called upon them to act and said that might have been done by some member of her family.

The father died suddenly, but the mother was in fail-

ing health for some years before her death. She expressed a desire to this daughter to be buried in the reform cemetery and wished that her husband's body be placed by her own. This witness, in answer to a question, said she was "not orthodox in any way, shape or form." When asked do "you object to your father lying buried in the orthodox Jewish cemetery?" she answered "I do, very much."

Dr. Isaac H. Goldman, a son forty-four years old, lives in Richmond, is a practicing physician and was his father's administrator. His testimony is in substantial accord with that of his sister. Like her, he is not orthodox but is a member of Beth Ahabah Synagogue and was a member of that synagogue at the time of his father's death. He put a tombstone on his grave, and when asked why he was late in raising objection to his place of burial said: "At that time, no, because my mother had been very ill; she had high blood pressure from the time of his death until the last 7 years, or 6 years, when she was paralyzed. She was paralyzed six or seven years ago and died with a stroke this last September." He said that his mother was an orthodox Jew and lived in that faith until after her husband's death, but that for the past ten or twelve years, "I wouldn't say she stuck strictly to the tenets of that religion."

I. Milchin is a trustee of the Montefiori cemetery. He said that Mr. Goldman was an assistant rabbi in Sir Moses Montefiori Synagogue but did not attend it regularly in the last years of his life because his feet hurt him and because his faith did not permit him to ride in a car on Saturdays. He said that his synagogue was of the orthodox faith and that all burials in its cemetery were conducted in strict conformity to its requirements.

Abraham Sherman was a member of this congregation. He said that Mr. Goldman was an orthodox Jew and a regular attendant and that Mrs. Goldman was an orthodox Jewess.

Robert Aurbach was a life-long friend of Mr. Goldman and had known him in Hampton where they both lived

before they came to Richmond. Goldman was a rabbi there. He held services and slaughtered animals for food according to the ritual of his church. Aurbach himself was an orthodox Jew and a member of the cemetery board, and it was because of these facts that the daughter, Frances, called him up and asked him to make the necessary burial arrangements. That he did. He selected the lot, she paid him $50 cash on deposit and the balance later, after which things went smoothly until the mother was buried in another cemetery. Goldman lived in the west end of Richmond and quite a distance from his synagogue. It was for that reason that attendance during the latter years of his life was not so unbroken as it had been, for his faith did not permit him to ride in a car on a Sabbath day.

Meyer Mollen was chairman of the cemetery board and thought that a deed had been delivered to the Goldmans for their lot, although he himself did not deliver it and had no positive knowledge of its delivery. The custom was to deliver deeds. He also said that he heard no trouble about Mr. Goldman's burial in that cemetery until after the death of his wife.

Max Friedman was a member and officer of the congregation. He said that Mr. Goldman was a shehitah and in that capacity attended to the killing of cattle and chickens according to orthodox Jewish law and was a regular attendant upon religious services in the synagogue until the organization of their little place of worship on West Broad Street. He further said that when a member of the congregation died it was the custom for a member of the family to call the chairman of the cemetery board and that with the consent of the family a section was then sold to it and could not have been sold otherwise.

S. Spilberg was also a trustee of the cemetery board and had been a presiding officer of the congregation for two years. He said that it was Mr. Goldman's custom to attend services almost every day but that in latter years he did

not do this because he was unwilling to ride on Saturdays. He also said that he saw Dr. Goldman in attendance at a memorial service for his father held in their synagogue.

Rabbi Max Forman is a resident of Petersburg and a spiritual leader of the orthodox community there, and said that he himself had been a student at the University of Pennsylvania in matters pertaining to his faith and is a graduate of that institution. He tells us of Jewish law.

"According to the Shulchan Arukh, which is the official body of Jewish Law, the Section Yore Deah, Section 363, paragraph One, which is ultimately based upon the Talmud, that is the body of official Jewish Law, Tractate Moed Katon, Chapter 3, of both the Babylonian and Jerusalem Talmuds, which, in turn, is based upon the Bible Chapter 28 of First Samuel, or the Third Chapter of Job, where references are made, in the first case, to the story of the Witch of Endor, in which King—If you will permit me to relate the story—

\*      \*      \*      \*      \*      \*      \*      \*      \*

"In which it is specifically stated that a body may not be disinterred except with two or three exceptions, and these exceptions I am prepared to state, as given in Jewish Law. First; that the body be buried a second time in Palestine. That has to do purely with a religious motive connected with the belief in the resurrection. Secondly; a body may be exhumed if the person has stipulated in his lifetime that he is being buried temporarily, that after a time he should be buried in another place. And a third exception, and only other exception, is the fact that whether a person is willing to be buried together with his parents together in a family plot in a family estate. That has to do purely with his parents, not with his children. According to this law it is the father that determines where the family should be buried. Where a father is buried there constitutes in itself, if there is room for it, a place where the other people of the family should be buried. A mother, or

a wife, should be buried next to the father, and not the father next to the mother. And the same thing goes for the children. The children should be buried near their parents and not the parents near the children."

He also said that a body might be disinterred when there was danger of its being washed away, or when burial had been in a non-Jewish cemetery, all of which is in accordance with Shulchan Arukh which had not been changed since the 17th Century and rests upon the Talmud, which, in turn, is based upon the Bible. To take up the body except in conditions named constitutes a desecration and a disrespect to the dead.

Rabbi Charles Podbelevitz was next called. He said that there were four sections of Shulchan Arukh, one of which is called Yore Deah; in it this rule appears:

"It is forbidden to remove, to exhume a dead person, body or his bones, neither from a respected burial place to another suitably respectable burial place."

Dr. Edward N. Calisch, a distinguished representative of his faith, was called upon to testify in rebuttal for the plaintiffs. He gives us an interesting history of Jewish law, in the course of which he said:

"Now the Shulchan Arukh continued to be, as I say, the law for those who chose to obey it, but with the emancipation of the Jewish people, there grew, so to speak, what we call a reform movement, and this reform movement felt that it had a right to interpret for itself. If I might compare it, I would say it is very much like the Protestant religion in which the right of individual judgment and individual conscience in interpretation of the Bible was insisted upon, and the reform movement among the Jews was in a sense the same thing. And as the reform movement grew, it began in Germany early in the 19th Century—they discarded many of the things that were insisted upon by the Shulchan Arukh. Now, therefore, insofar as Jewish Law is concerned, the law is the

law for those who choose to accept it. I mean, the orthodox law, the Shulchan Arukh. It is repudiated by a very large body of the Jewish people."

He thought that in accordance with the reformed interpretation of the law there could be no objection to this disinterment, but in an affidavit which he gave in another case in which the father was buried in a particular place and the mother was brought óver to rest by him, he said: "* * * 'Ordinarily Jewish practice objects to the removal of a dead body from one grave to another out of consideration and respect for the dead. It is believed that after having been put to rest the dead should not be disturbed. If, however, there is any valid reason for the removal, especially if there is any consideration which . would justify this assumption, that were the dead alive he or she would consent to the change in the resting place, the Jewish Law and practice permits such a removal.' As, for example, the Shulchan Arukh, 341—that is the same— permits the disinterment and removal of a dead body in order to bury the same in another place together with his or her relatives. This is exactly like the case you state, the son being desirous of having his mother's remains rest in the same place where his father was."

Rabbi Sidney Lefkowitz is an assistant of Dr. Calisch at Beth Ahabah Synagogue and a graduate of the Hebrew Union College in Cincinnati, a seminary for reformed rabbis. He said that there was considerable difference between the customs and laws of the reformed synagogues and orthodox synagogues. He was of opinion that Mr. Goldman's body might be disinterred without violating any law because of the particular circumstances of this case. Miss Frances Goldman was recalled and said that she made no arrangements with Mr. Aurbach about the funeral and that he is mistaken in his evidence.

Rabbi Aaron H. Lefkowitz was of opinion that under the facts in this case, stated hypothetically, the removal of the body would not be in violation of Jewish law.

This evidence, as we have seen, was taken in open court. The chancellor presiding saw the witnesses and heard them testify. His judgment, therefore, on matters in dispute is entitled to that weight which always obtains in such circumstances. In the light of this rule we may take as established the following facts:

Benjamin Goldman, at all times in his life, was a devout and consecrated orthodox Jew and was a member of an orthodox synagogue at the time of his death. His burial was in strict accordance with its laws and rituals. The lot in which he was placed was in an orthodox cemetery and was bought and paid for after his death by his family. On it they placed a monument to his memory. Mrs. Goldman was also an orthodox Jew and continued in that faith throughout her husband's life.

Some time after the husband's death, the widow drifted away, grew to sympathize with Reformed Jewish worship, and expressed a desire, during her long last illness, to be buried beside her husband in a reformed Jewish cemetery. Her children buried her there and now wish to place her husband by her side. If this is to be done, he must be disinterred and buried where he did not want to be buried.

It is true that Mr. Goldman did not expressly state to any one, so far as this record shows, where he desired to be buried, but he was an orthodox Jew and was a member, officer and priest in his synagogue. That he desired his body to be dealt with according to the tenets of his faith is an inevitable conclusion, and a conclusion, as we have seen, recognized by his family. We do not doubt that a devout Catholic would wish to be buried in consecrated ground and would object to his body being taken from such a place and put in a Protestant cemetery, and we do not doubt that a Bombay Parsee would wish to come to final rest on Malabar Hill. These are among the things we know without being told. Goldman's whole life is an impressive expression of his will. One must be

anxious to doubt who has doubt about decedent's desires. The depth of his desire to be buried where he was buried may be measured by the will of his children, to whom that desire is distasteful.

Schisms in churches are too often the source of un-ending feuds. Dr. Calisch, we have seen, compares that in his to the Catholic and Protestant branches of Christian faith. It is for this reason that we who are always orthodox pray to be delivered from all false doctrines, heresy and schisms.

■ Primarily decedent's place of burial rests with his personal representatives, his widow or his next of kin.

Ordinarily personal representatives are not appointed until later and so this choice usually is made by the family. *Awtrey* v. *Norfolk & W. Ry. Co.*, 121 Va. 284, 93 S. E. 570, L. R. A. 1918. D, 279.

As between them, the wishes of the widow should prevail. *Bonaparte* v. *Fraternal Funeral Home, et al.*, 206 N. C. 652, 175 S. E. 137; *Hackett* v. *Hackett*, 18 R. I. 155, 26 A. 42, 19 L. R. A. 558, 49 Am. St. Rep. 763; *Moore* v. *Sheafer*, 282 Pa. 360, 127 A. 784; *Curlin* v. *Curlin* (Tex. Civ. App.) 228 S. W. 602, 21 A. L. R. 653; *O'Donnell* v. *Slack*, 123 Cal. 285, 55 P. 906, 43 L. R. A. 388. Indeed this primary right of the widow, in the absence of special circumstances, is almost everywhere recognized, but, as we shall see, when the choice has once been made, when this right has once been exercised, other considerations enter into any changes proposed.

■ In a commercial sense, there are no property rights in the bodies of the dead, but their survivors have a right to their possession and the right to make final disposition thereof, decently and in order. But this right carries with it corresponding obligations; disposition when made must be seemly and proper. *Awtrey* v. *Norfolk & W. Ry. Co.*, *supra*; 17 C. J., p. 1137. That this may be done, cemeteries where permanent care is measurably assured are usually selected. Title to lots therein is not ordinarily

absolute, nor is a deed necessary. That acquired is rather in the nature of a permanent easement. *Roanoke Cemetery Co.* v. *Goodwin*, 101 Va. 605, 44 S. E. 769. Interments once made should not be disturbed except for good cause.

In the light of what has been said, we reach, without difficulty, these conclusions:

Mr. Goldman was buried where he wanted to be buried. Moreover, if we for the moment assume that the right of choice rested absolutely in the widow, he was buried where she wanted him to be buried, and this wish of hers stood unchanged for years. The selection then had the approval of the entire family, or in any event its consent, and was ratified by a monument subsequently erected. In short, Mr. Goldman was buried where he wanted to be buried and where his family wanted him to be buried. This change, if made, places him where he did not wish to be placed, and, if made, must be made for religious reasons only, because in the Sir Moses Montefiori Cemetery lot where he is buried there is ample room for the burial of all of his people.

In the petition for appeal, it is said that the petitioners have consistently maintained "* * * that the cemetery trustees are not parties in interest." This contention is not carried into the assignments of error, is not further adverted to and appears to have been abandoned, but in any event it is not well taken.

Plainly the trustees of a cemetery have a right to object to its dead being disturbed, and they have the right to be heard.

In *Hudek* v. *St. Peter Greek Catholic Cemetery Ass'n,* (Sept. 22, 1907), 101 N. J. Eq. 399, 138 A. 654, 655, it appears that the deceased owned a lot in that cemetery. The trustees believed that he had committed suicide and refused a burial permit. The court said that to ascertain the propriety of this refusal, "a judicial determination is necessary."

If cemetery authorities may be heard before one can be buried, they may be heard when in their judgment there is an unlawful disinterment undertaken.

██ "* * * it always has been, and will ever continue to be, the duty of courts to see to it that the expressed wish of one, as to his final resting place, shall, so far as it is possible, be carried out." *Thompson* v. *Deeds*, 93 Iowa 228, 61 N. W. 842, 843, 35 L. R. A. 56; *Yome* v. *Gorman* 242 N. Y. 395, 152 N. E. 126, 127, 47 A. L. R. 1165.

Cases constantly arise in which disinterment should be permitted, but where this right is not conceded, they should be heard upon their merits and decided upon their merits.

██ It is next said that evidence of Jewish law should not be received. Jewish law, as such, is no more to be followed in Virginia than is Chinese law, but it may be both competent and important to show the custom and wishes of those who observe its mandates, and this is particularly true when they believe that they are in part divine.

In *Yome* v. *Gorman, supra,* Cardozo, J., said: "A rule of the Church forbids the removal of a body from consecrated ground to ground that is unconsecrated, or consecrated to another faith."

*Sacred Heart, etc., Church* v. *Soklowski,* 159 Minn. 331, 199 N. W. 81, 82, 33 A. L. R. 1427, is a leading case. It there appears that Joseph Soklowski was a member of Sacred Heart, etc., Church. That church claims that its doctrines are identical with those held by the Roman Catholic Church, but it is an independent organization and does not recognize the Pope as its head. Soklowski was, in accordance with his earnest wish, buried in the cemetery of his church. His wife was a member of the Roman Catholic Church and desired to move his body to a Catholic cemetery.

The burial was upon the insistence of her son, to which the widow yielded with reluctance.

"But she yielded to her son's insistence that her husband be interred in plaintiff's cemetery, upon the son's assurance that he had obtained permission from the priest in charge of the plaintiff congregation to remove the body whenever she wanted to thereafter."

The lower court held that the wishes of the deceased "should be scrupulously carried out, and that the wishes of the survivors" should be secondary. This the Supreme Court of Minnesota said was too broad a statement and cited in support of its conclusion and with its approval this statement from *Pettigrew* v. *Pettigrew*, 207 Pa. 313, 56 A. 878, 64 L. R. A. 179, 99 Am. St. Rep. 795. That court went on to say that the paramount right of choice was in the widow, and that how far the desires of the decedent should prevail against those of a surviving husband or wife is an open question, and further, "With regard to a reinterment in a different place, the same rules should apply, but with a presumption against removal growing stronger with the remoteness of the connection with the decedent, and reserving always the right of the court to require reasonable cause to be shown for it." The Minnesota court also said that there was strong evidence to show that Soklowski himself recanted when he came to die, that he had been brought up a Roman Catholic, that it is a doctrine of that church that one who is once a Catholic is always a Catholic, and that he did not send for a priest of his own church to administer the last sacrament but to a priest of the Catholic Church. In other words, the court was of opinion that there was strong evidence to show that Soklowski died in the faith of the ancient church.

Goldman died an orthodox Jew. Mrs. Soklowski was a Catholic when Mr. Soklowski died and had always been of that faith. Mrs. Goldman was an orthodox Jewess when her husband died. Mrs. Soklowski's consent was condi-

tional. There is nothing which even tends to show that there were any conditions attached to the consent of Mrs. Goldman. The presumption is that it was then in complete accordance with her wishes.

In passing it may be said that the Minnesota Supreme Court was of opinion that the owner of the cemetery was a proper party to that suit.

In the *Pettigrew Case* James. Pettigrew died suddenly without making any provisions as to the place of his interment. There was a conflict of evidence as to the then wishes of his widow. Her evidence was that it was her intention to bury him where he was buried temporarily. The court said that the question as to how far decedent's wishes were to prevail was an unsettled question, and did not undertake to settle it. No questions of faith were involved, but the court found as a fact that in the lot where the husband was buried there was not room to bury the widow and their daughter, and so a removal was permitted.

In *Yome* v. *Gorman, supra,* it appears that Yome and his wife purchased a lot in a Catholic cemetery. Yome died in the faith of his church and was buried there. Both he and his wife were Catholics. She then left that church and demanded permission of the supervisor of the cemetery to remove her husband's body. This was refused and suit was brought. In that case a wealth of authorities are cited by Judge Cardozo. He referred, as we have seen, to a rule of the church which forbids the removal of a body from consecrated ground to that unconsecrated or consecrated to another faith. He said that the wish of the deceased, though no legal compulsion might attach, was of large significance, and particularly so when that wish had its origin in religious feeling.

"Only some rare emergency could move a court of equity to take a body from its grave in consecrated ground and put it in ground unhallowed if there was good reason to suppose that the conscience of the deceased, were he alive, would be outraged by the change. Subordinate in

importance, and yet at times not wholly to be disregarded, are the sentiments and usages of the religious body which confers the right of burial."

That case, in all of its essentials, is like this in judgment and is probably the leading case on this subject. There, as here, we have the deliberate consent of a widow once given, and in each case later we have an effort to take a body from its grave in consecrated ground.

On this subject there is a staggering wealth of cases. To undertake any detailed discussion of them would be endless and fruitless. In the main, each turns upon its facts. The wishes of the widow and of the next of kin are entitled to tender consideration, and the wishes of the deceased, particularly when their origin rests on matters of faith, are not to be overlooked. Here Goldman was buried where he wanted to be buried and where his widow wanted him to be buried, and this was no mere personal preference but had its origin in deep religious feeling. Afterwards it may be said of his widow, as was said of Mrs. Yome, there was "a change of heart." She and her children then desired that he be placed in what was to him unconsecrated ground. There was no "rare emergency." The faith of those surviving might change but the wishes of the dead are irrevocable.

Sentiments of conjugal and filial affection, though their existence is not questioned, are not the moving causes of this controversy. There has never been anything to prevent the burial of every member of this family beside the father in this lot amply large. Religious motives prompt this litigation. An orthodox Jew has been buried in an orthodox cemetery where he wished to be buried and where he has rested for more than twelve years. The children now, because they are of another faith, would place their father in what to him is unhallowed ground. That deference which for this reason is due to the choice of the children, is also due to the wishes of the father.

Finally it is said that even if Jewish law is to be observed,

the removal desired comes within a well recognized exception for which provision is therein made. As to this we have a conflict in evidence and the chancellor's conclusion; nor is one who rejects a faith a safe expositor of its creed. Those who are of opinion that the exception applies are of the reformed faith.

The decree appealed from should be affirmed, and it is so ordered.

*Affirmed.*