677 A.2d 623

**Virginia Eleanor Humbrecht KLINE, et al.**

v.

**GREEN MOUNT CEMETERY, et al.**

**No. 1531, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

June 4, 1996.

Mark S. Zaid, Washington, DC, for Appellants.

Francis J. Gorman (Gorman & Williams, on the brief), Baltimore, for Appellee.

Before WILNER, C.J., EYLER, J., and JAMES S. GETTY, Judge (retired), Specially Assigned.

WILNER, Chief Judge.

The zany comedian, Groucho Marx, forever tried to stump contestants on his popular television quiz show with the question, "Who is buried in Grant's tomb?" That, of course, was farce and comedy. Appellants here are much more serious. They are distant relatives of John Wilkes Booth—the assassin of Abraham Lincoln—and they want to know who is buried in Booth's tomb.

To get that answer, appellants filed a petition in the Circuit Court for Baltimore City to have the remains of the person thought to be John Wilkes Booth exhumed from the Booth family plot in Green Mount Cemetery and examined. Their

hypothesis was that the body buried there was not that of Booth—that Booth had escaped from the Union troops sent to find and capture him and that, to cover up its mistake in announcing that Booth had been shot to death, the Government had someone else buried in Booth's place.

The cemetery was allowed to intervene in the case. After a four-day trial, the court denied the petition. Judge Kaplan concluded:

"To summarize, the alleged remains of John Wilkes Booth were buried in an unknown location some one hundred twenty-six (126) years ago and there is evidence that three infant siblings are buried on top of John Wilkes Booth's remains, wherever they may be. There may be severe water damage to the Booth burial plot and there are no dental records available for comparison. Thus, an identification may be inconclusive. A distant relative is seeking exhumation and any exhumation would require that the Booth remains be kept out of the grave for an inappropriate minimum of six (6) weeks. The above reasons coupled with the unreliability of Petitioners' less than convincing escape/cover up theory gives rise to the conclusion that there is no compelling reason for exhumation."

In this appeal, appellants make three complaints: (1) the court erred in failing to restrict the role of Green Mount Cemetery in opposing the exhumation; (2) it erred by failing to recognize Virginia Kline as a proper party to the petition; and (3) its factual determinations were clearly erroneous. We find no merit in these complaints and therefore shall affirm.

## BACKGROUND

### Introduction

Courts are constantly called upon to decide, from conflicting evidence, what is fact. That, indeed, is their daily fare. They have, of course, no firsthand knowledge of what is fact—who really had the green light, whether it was the defendant who actually shot the victim—but, to perform their public role as adjudicator, they are empowered to declare, from the evidence

presented to them, what is fact, and, based upon those declarations, whether implicit or explicit, to enter judgments.

This case involves that process as well, but in a somewhat unusual context. Appellants' case rests, ultimately, on the proposition that a piece of conventional, widely accepted American history is not accurate; they posit that John Wilkes Booth was not killed by Union troops on April 26, 1865, as commonly believed, but that he somehow managed to escape and that he may have gotten to Texas and Oklahoma and survived under assumed names until 1903.

■ At this stage of the case, appellants have retreated somewhat from the outright assertion that Booth did escape. They do maintain, however, that there is a sufficient likelihood of that having occurred to justify disinterring the remains of the person thought to be Booth in order to make a more complete investigation.

Appellants recognize that they have no *right* to a disinterment; indeed, the law plainly disfavors such actions. Judge Cardozo perhaps said it best for the New York Court of Appeals in *Yome v. Gorman,* 242 N.Y. 395, 152 N.E. 126, 129 (1926): "The dead are to rest where they have been laid unless reason of substance is brought forward for disturbing their repose." *See also Dougherty v. Merc.-Safe Dep. & Tr.,* 282 Md. 617, 620, 387 A.2d 244 (1978), quoting and adopting that view and making clear that, after burial, descendants do not have property rights in the body, for it is in the custody of the law.

Unlike most cases of this kind, the reason asserted by appellants for exhuming the body has nothing to do with the personal wishes of those who knew and loved the decedent, for no such person is still alive, or with any religious or other emotional imperative, or with any external exigency. It is founded almost entirely on their perception of historical accuracy, which differs radically from the officially documented and conventionally held belief. Thus, the court is called upon to determine, at least in part, whether they have made a sufficient case, based on the evidence they presented, that the accepted history is *not* accurate and is in need of this kind of

further inquiry. Appellants, and perhaps more credentialed scholars, may continue the academic debate over what actually happened to John Wilkes Booth in the days and years following April 14, 1865; our appraisal of the fact is a judicial, not an academic, one, based on what has been presented in evidence. What follows must be taken in that light.

## Conventional History

On April 9, 1865—Palm Sunday—Robert E. Lee surrendered the Army of Northern Virginia to Ulysses S. Grant at the McClean home in Appomattox Courthouse, Virginia, effectively concluding the rebellion that is still regarded as this country's most wrenching national experience. President Lincoln was busy during the ensuing days dealing with the myriad of military and political details comprising the aftermath of the surrender and presaging the beginning of national reconciliation.

April 14 was Good Friday. At his wife's urging, President and Mrs. Lincoln attended a performance of what Carl Sandburg has referred to as a "third-rate drama," *Our American Cousin*, at Ford's theater. The couple arrived at about 9:00; the play was in progress but was temporarily interrupted when the audience, learning of the President's arrival, stood and cheered him. He acknowledged the ovation from his flag-draped box. The play then proceeded. Just after 10:00, Booth entered the theater, climbed the stairs and was allowed to proceed through the Dress Circle into the hallway leading to the boxes. He entered Box 7, and, with a single-shot derringer pistol, propelled a lead ball obliquely into the left side of the President's head. Major Henry Rathbone who, with his fiancee, had accompanied President and Mrs. Lincoln to the theater, attempted to grab Booth, who was armed also with a knife, and was slashed on his left arm for his effort. Booth jumped over the railing to the stage some 12 feet below, injuring his leg in the process. There was some evidence that he became entangled in one of the flags and actually fell on to the stage. He shouted something to the audience; the popular version is that he cried the motto of Virginia, *Sic Semper*

*Tyrannis,* although some witnesses claimed that he shouted other slogans—"The South is avenged," or "The South shall be free." [1] With his knife, Booth threatened the one actor then on the stage and other persons nearby, made his way outside, mounted the rented horse that he had waiting in the care of a stable-boy, and made his immediate escape.

The President was taken to the home of William Peterson, across the street from the theater, where, despite the efforts of the Lincoln family physician, the Surgeon General, and other doctors in attendance, he remained unconscious and eventually expired at 7:22 the next morning, April 15.

It appears that Booth, followed closely by his accomplice, David Herold, and pursued by the stable-boy from whom he had rented the horse, made his way to the Navy Yard bridge, which he and Herold, but not the stable-boy, were allowed to cross into Prince George's County. They proceeded first to John Surratt's tavern, where they retrieved a carbine and some other items they had previously stored there, and then, about dawn on the 15th, to the home of Dr. Samuel Mudd. Mudd, claiming to have been unaware at the time that Booth had assassinated Lincoln, set Booth's broken leg and gave him a pair of crude crutches. It was there that Booth shaved off his mustache.

It did not take long for the authorities to identify Booth as the assassin and to form the belief that John Surratt and David Herold were his accomplices. In part, at least, that information came from the stable-boy who had pursued Booth and from the guard at the Navy Yard bridge who had let

---

1. It was later established that Booth's act was part of a larger plot, involving as well an attempt to assassinate Vice President Andrew Johnson and Secretary of State William Seward. George Atzerodt was assigned the task of killing the vice-president, but he apparently lost his nerve at the last moment and fled to his cousin's farm in Maryland, where he was arrested on April 20. Lewis Powell, with David Herold as a look-out, went to the Seward home and attacked some of the people there, although he failed in his attempt to kill Seward himself. Herold abandoned Powell and eventually met up with the fleeing Booth. Powell never made it out of Washington; he was arrested at the home of Mary Elizabeth Surratt on H Street.

Booth and Herold pass. Within days, posters containing Booth's picture and announcing rewards of $50,000 for his capture and $25,000 each for the capture of Surratt and Herold, were widely circulated throughout the area. Union troops, following various leads, promptly commenced a widespread search for everyone thought to be involved.

After leaving the Mudd home, Booth and Herold made their way over the next several days to the Potomac River, crossing into Virginia on the night of April 22. On the 24th, they crossed the Rappahannock at Port Conway where they came upon three former Confederate soldiers, including William Jett. Jett led them first to the Peyton home in Port Royal, where they were refused lodging, then to a tavern known as "The Trappe," and finally to the farm of Richard Garrett. Garrett may have allowed Booth to stay in the house the first night but at some point made him move to the barn; Herold remained with Jett for another day but then joined Booth at the Garrett place. Garrett locked the barn, and he and his brothers kept an eye on it, for fear that their guests might steal the Garretts' horses.

Meanwhile, a unit of detectives assigned to the War Department learned that Booth and Herold may have crossed the Potomac. They secured a detail of 26 troopers from the 16th New York Cavalry as an escort and set out to search for the pair. The group reached Port Conway on the 25th and, from inquiries, learned that Booth, without a mustache, had joined with Jett and others and that Jett could likely be found at the Star Hotel in Bowling Green. The unit surrounded the hotel, found Jett and took him prisoner, and was informed by him that Booth and Herold were at the Garrett farm.

Under the command of Lt. Edward Doherty, the cavalry unit arrived at the Garrett farm around 3:00 a.m. on April 26. They had pictures and a description of Booth. Stories differ somewhat as to why they turned their attention to the barn. Under one version, one of the soldiers, Emory Parady, heard noises inside the barn and alerted Lt. Doherty. Under another, one of the Garrett brothers, under some measure of

duress, informed the soldiers that the pair were in the barn. Doherty then ordered the occupants to come out and, after some period of negotiation, threatened to set the barn on fire. That was enough for Herold, who came out and was captured. Booth remained inside. Around 4:00, Detective Everton Conger set the barn ablaze. Booth could be seen inside carrying a pistol and a carbine. A single shot then rang out and struck Booth in the neck—some profess that Booth shot himself, others maintain that it was either Conger or Detective Luther Baker who fired the shot to keep Booth from revealing a larger government conspiracy. The best evidence, and the official report, is that Booth was shot from some distance by Sergeant Boston Corbett's revolver. Two men—Baker and Conger—ran to the blazing barn and pulled Booth out. He was still alive, but he died two to three hours later.

Booth's body was taken by wagon from the Garrett place to the steamboat *John S. Ide,* which had ferried the Union troops down the Potomac, and was carried then, in the custody of Detective Baker, to the USS *Montauk* in Washington. Aboard the *Montauk,* an inquiry was held by Army Judge Advocate General Joseph Holt. Several witnesses identified the body as that of Booth. Thereafter, Surgeon General Joseph K. Barnes conducted a post mortem examination, noting the cause of death as a gunshot wound to the neck, the ball passing through the bony bridge of the fourth and fifth cervical vertebrae and severing the spinal cord. Dr. Barnes also noted that the left leg was encased in splints and bandages, upon the removal of which a fracture of the fibula three inches above the ankle joint was discovered.

Following the autopsy, the body was taken to the former Washington Penitentiary and buried in a storage room. In 1867, it was disinterred and buried in another storage area at the penitentiary. In 1869, near the end of his administration and at the request of Booth's mother, Mary Ann Booth, and his brother Edwin Booth, President Johnson released the body to the family for permanent burial in the family plot at Green Mount Cemetery in Baltimore. John H. Weaver, a Baltimore undertaker and Sexton of Christ's Church, took

possession of the box containing Booth's remains in February, 1869, and removed it to his private vault at Green Mount Cemetery, to await warmer weather for digging a grave.[2] Burial occurred on June 26, 1869, in the presence of Booth's mother and two brothers. At the request of his brother, Edwin, the grave was not marked. The body so buried has remained there, undisturbed, to this day, nearly 127 years.

### Appellants' Petition and the Cemetery's Response

On October 31, 1994, Nathaniel Orlowek, Arthur Ben Chitty, Virginia Kline, and Lois Rathbun filed an *ex parte* petition to exhume the alleged remains of John Wilkes Booth from Green Mount Cemetery. Orlowek was identified as a religious educator with a bachelor's degree in history who has "spent the majority of his life examining the details of the life and death of John Wilkes Booth." His research, he averred, "has been prominently featured on many radio and television programs, including ABC's 20/20 and a 1991 segment of NBC's Unsolved Mysteries." Chitty was identified as a "historiographer" who has "actively researched the circumstances surrounding the escape of John Wilkes Booth since the 1950s," and whose research has appeared in such scholarly journals as the *Chattanooga News–Free Press* and the *Baltimore Sun*. Ms. Kline identified herself as a third cousin of Booth; her great-grandmother was Booth's aunt—the sister of his father. Ms. Rathbun claimed to be the great-great-niece of Booth. Other persons, denominated as "interested non-parties," consisted of a collection of third, fourth, and fifth cousins of Booth and claimed to be, in addition to Ms. Kline and Ms. Rathbun, the lawful heirs and direct descendants of Booth.

The petition asserted that many stories had surfaced over the years challenging the official history that Booth was killed by Union troops at the Garrett farm, but that one story in

---

**2.** There was testimony by the President of the Board of Managers of Green Mount Cemetery that it was not uncommon in those days, and even today, for bodies to be placed in a "receiving vault." He explained that, at least then, if it was winter and the ground was frozen, it would be impossible to dig open a grave.

particular had survived "with its credibility and persuasiveness intact." That story was an account by a lawyer in Granbury, Texas named Finis L. Bates, published in a 1907 book entitled *The Escape and Suicide of John Wilkes Booth.* In this book, Bates described meeting a man in 1872 by the name of John St. Helen who, five years later, believing himself near death, confessed to Bates that he was John Wilkes Booth. This man told Bates that he had escaped from the Garrett farm and that the person killed by the Union troops was a "young man named Ruddy or Robey." According to Bates, he did not see St. Helen again until 1903, when he learned that the man, then calling himself David George, had committed suicide in Enid, Oklahoma. Bates had the body mummified, and the mummy was later exhibited throughout the United States under the name of John Wilkes Booth. At some point, an autopsy was performed on the mummy.

The petition went on to challenge certain details of the official record based, in large part, on newspaper stories, photographs of St. Helen (or George), examination of the mummy, and second and third-hand hearsay statements casting doubt on the various identifications of Booth's body following the events of April 26, 1865. The concluding paragraph acknowledged that the petitioners could not "ascertain the credibility of the people who provided the testimony or affidavits that originally spurred this debate" but that the technology "now exists to close the books on this controversy forever, and ensure that history has been taught correctly or is corrected."

Green Mount Cemetery moved to dismiss the petition on the grounds that an *ex parte* petition was not the proper procedure, that this one in particular failed to state a claim upon which relief could be granted, and that the petitioners lacked standing. The court granted the motion with leave to amend, and an amended petition was filed, this time by Ms. Kline and Ms. Rathbun alone, who asserted standing as the legal heirs of Booth. The rest of the amended petition was not substantially different from the initial one in its recital of the dispute engendered by Bates's 1907 book and the various

statements and reports challenging some of the details and identifications that form part of the official history.

The cemetery answered the amended petition. It stated its interest as having been entrusted by Mary Ann Booth with the remains of her son, John Wilkes Booth, and other members of the Booth family who are buried in the family plot. Most of the factual allegations in the petition were denied; as to others, the cemetery said that it had no knowledge. It challenged the standing of the two remaining petitioners and asserted that the petition did not contain substantial evidence or present to the court substantial reason to justify disinterment and exhumation of the remains. The petitioners responded with a motion to dismiss the cemetery or, in the alternative, to "delineate" its role. They averred that the cemetery's presence in the case was unnecessary and improper and that, at the very least, its role should be "restricted to the introduction of evidence pertaining solely to potential violations of its regulations, and it should be precluded from directly challenging the merits of the Petition."

That motion was denied, and, as a result, the cemetery was allowed to present substantial evidence in support of the official history indicating that (1) Booth is indeed buried in the cemetery, (2) no one knows exactly where he is buried, (3) there likely are other bodies buried on top of his, which would have to be disturbed in order to disinter Booth's remains, (4) remains located in the Booth plot may be damaged by water, and (5) even if the body were exhumed, a positive identification of it, for a number of reasons, is unlikely. The court obviously accepted much of that evidence and discounted the conflicting evidence produced by the petitioners. Hence, this appeal.

## DISCUSSION

### The Role of Green Mount Cemetery

█ Appellants' first complaint is that the court failed to restrict the role of the cemetery in challenging their petition. Their argument is that, when there is no dispute among the

family members—and there was none here—cemeteries should be only a nominal party, whose role should be restricted to ensuring that their regulations or other relevant agreements are not violated by the disinterment.

In most of the cases in which a court order is sought allowing or precluding a disinterment—other than for public necessity, such as a criminal investigation—the disagreement bringing the case to court is among family members, often over a desire by someone to change the place of burial. *See,* in general, Annotation, *Removal And Reinterment Of Remains,* 21 A.L.R.2d 472 (1952). In many of those cases, as noted by appellants, the cemetery indeed chooses to play a passive role, allowing the warring relatives to make their respective cases; the cemetery is often named as a defendant so that it will be bound by, and have the protection of, any ultimate court order. As a result, while the case law is fairly well-developed with respect to who may seek disinterment and what other family members must or may be joined in such actions, there are few decisions defining the role of cemeteries.

It is not the case, however, as appellants contend, that, absent some contract or regulation specifically barring or limiting disinterment, the cemetery is necessarily restricted to a neutral or passive role. There are instances in which the cemetery has been allowed to take an active role in opposing a disinterment. *See,* for example, the oft-cited case of *Sacred Heart of Jesus Polish Nat. C. Church v. Soklowski,* 159 Minn. 331, 199 N.W. 81 (1924), in which a cemetery was granted standing to sue as a plaintiff to enjoin a disinterment, the Court holding 199 N.W. at 82 that

> "[a]s owner of this cemetery, in guarding the repose of the dead there interred, and as interested in carrying out the expressed desire of its members as to their final resting place, we think there can be no question of plaintiff's right to maintain an action of this sort."

*See also Goldman v. Mollen,* 168 Va. 345, 191 S.E. 627 (1937). There, too, a cemetery actively opposed a request for disinterment, on the ground that disinterment would violate religious

precepts to which the cemetery subscribed. That opposition was challenged by the plaintiffs. 191 S.E. at 632, the Court noted:

> "In the petition for appeal, it is said that the petitioners have consistently maintained ' * * * that the cemetery trustees are not parties in interest.' This contention is not carried into the assignments of error, is not further adverted to, and appears to have been abandoned, *but in any event is not well taken.*
>
> *Plainly the trustees of a cemetery have a right to object to its dead being disturbed, and they have the right to be heard.*"

(Emphasis added.)

For other cases in which a cemetery has been allowed to assert active opposition to disinterment, *see Uram v. St. Mary's Russian Orthodox Church,* 207 Minn. 569, 292 N.W. 200, 201 (1940), and *Yome v. Gorman, supra,* 242 N.Y. 395, 152 N.E. 126, 128.

The Maryland courts as well have, at least tacitly, recognized the right of a cemetery to oppose the disinterment of remains. In *Unterstitzung Verein v. Posner,* 176 Md. 332, 4 A.2d 743 (1939), a cemetery actively opposed an attempt by the petitioner to remove his father's remains for reburial elsewhere. The trial court overruled the cemetery's demurrer, which was based on lack of jurisdiction, and the Court of Appeals affirmed that determination, holding that an equity court did have jurisdiction to entertain such a complaint. In doing so, however, the Court plainly recognized the right of the cemetery to oppose the request on the merits, based essentially on its "hav[ing] in charge the remains of the dead, whose right of sepulture should not be disturbed, except upon most unequivocal legal grounds[.]" *Id.* at 336, 4 A.2d 743, quoting from *Browne v. M.E. Church,* 37 Md. 108, 123 (1872).

Two other aspects of the *Unterstitzung* case are also of interest. In considering the merits of the issue—when a disinterment, other than for public necessity, ought to be allowed—the Court, at 338, 4 A.2d 743, noted three factors:

"(1) the wishes of the deceased, when they can be ascertained, and in connection with this, the influence of his religious faith in the decision or request; (2) the wishes of the widow or widower, and next after them, the next of kin, if near enough to have their wishes respected; (3) *the agreement or regulations of the body maintaining the cemetery.*"

(Emphasis added.)

Additionally, in remanding the case for further proceedings, the Court addressed the order allowing the decedent's brother and nephew to intervene as defendants, which it reversed, holding at 340, 4 A.2d 743, that "[t]he mere fact that they are brother and nephew of the decedent is no reason, while there is a son surviving as next of kin, who has shown such interest in the matter as to engage in a contest with the cemetery company, *which is a proper party.*" (Emphasis added.)

We gave recognition to the interest of the cemetery in *Walser v. Resthaven*, 98 Md.App. 371, 633 A.2d 466 (1993), *cert. denied*, 334 Md. 212, 638 A.2d 753 (1994). At 381, 633 A.2d 466, we noted three broad principles: (1) the normal treatment of a corpse, once it is decently buried, is to let it lie; (2) respectful disinterments have been looked upon as private concerns of the deceased's family *and the cemetery* if they all agree; and (3) if there is any disagreement among the family *or the cemetery* as to any contemplated or completed disinterment, relief can be granted in either law or equity, depending on the nature of the controversy.

Green Mount Cemetery does have an interest in opposing the disinterment. In the Act of the General Assembly incorporating the cemetery (1837 Md. Laws, ch. 164), the Legislature noted, as a basis for the incorporation, that it was "reasonable and necessary to provide for the permanence of the said establishment so that those who bury there, may be assured of perpetual protection to the remains of relatives and friends, and for the decent preservation of the grounds." In the Certificate of Ownership issued by the cemetery to Mary Ann Booth in June, 1869, the cemetery conveyed the lot, for

the purpose of sepulture, *subject to that Act of incorporation.* This could well be taken as at least an implied, if not an express, commitment to her to assure the perpetual protection of her son's remains.

Mrs. Booth, of course, is no longer alive to take a position. With the passage of more than a century, there are no immediate relatives left; Booth had no spouse and no children and thus no direct lineal descendants. If Green Mount is not allowed to offer active opposition—to challenge with reputable documentary evidence the tenuous hypothesis constructed by appellants and to present other reasons why exhumation is not called for—there would, in this case, be no one to do so. The proceeding would effectively revert to the *ex parte* one appellants initially sought, and the presumed desires of Booth's mother and brother that his body remain at peace and undisturbed would be given little recognition. To accept appellants' view would be to allow distant relatives who never knew the decedent, years after his or her death, to override the wishes of those who were indeed the next of kin and who had the right, under the law, to determine the place of burial. Here, even more than in *Unterstitzung,* where a brother and a nephew were available, there was a need for the cemetery to challenge the petition.

### Standing of Virginia Kline

■ In the initial petition and in the amended petition, Ms. Kline identified herself as a third cousin of Booth. She now tells us that she is a first cousin twice removed. She acknowledges that she is not a next of kin and certainly not the nearest next of kin, although she does claim a one-third interest in the Certificate of Ownership to the Booth family plot.

Ms. Kline seems to believe that she was found not to be a proper party to seek disinterment and exhumation, for she alleges that the court erred in so finding. We are unable to discover any such finding by the court. The court discussed in its memorandum opinion the status of both Ms. Kline and Ms. Rathbun and held that Ms. Rathbun was a proper person

to seek exhumation. It made no finding at all with respect to Ms. Kline and did not purport to dismiss her as a plaintiff for lack of standing. Even if it did, however, we would find no reversible error. Ms. Rathbun was allowed to proceed, and, as her interest and position were, in all material respects, identical with those of Ms. Kline, any error in finding a lack of standing on Ms. Kline's part would be harmless. The finding, if there was one, was made at the end of the case and did not, in any way, adversely affect the presentation of evidence or argument in support of the petition. There was less reason to allow Ms. Kline to proceed here than there was to allow the brother and nephew to intervene in *Unterstitzung*.

## The True Facts

Appellants tell us in their brief that their evidence that a compelling reason existed to exhume the remains was in two parts: "(1) that the evidence of the alleged identification and autopsy of JWB were equivocal and fraught with errors; and (2) that Booth escape theories have constantly persisted since 1865 and with the help of science the theory can finally be proven or disproved."

We come back at this point to the earlier discussion. Appellants essentially pick at what they perceive to be gaps in the evidence. They note that, although Jett identified the person he had assisted as Booth, he never identified the body of the person shot at the Garrett farm. He did, of course, lead the Union detachment to the farm and to the encounter at the barn, which contained only two people, one of whom—Herold—surrendered. They also aver that the persons at the farm—the Garretts, Sergeant Corbett, Baker, Parady—did not know Booth. Others who later identified the body, they say, "barely knew" Booth, and, in light of that and of certain inconsistencies in their stories, their identifications are simply not reliable.

In contrast, evidence was produced not only that the Union soldiers and detectives at the Garrett farm had pictures of Booth, which they used in making their identifications, but that Lt. Doherty actually knew Booth personally. It will be

recalled that the Judge Advocate General conducted an inquest aboard the USS *Montauk* prior to the autopsy. One of the witnesses examined was Charles Dawson, who said that he was a clerk at the National Hotel in Washington, where Booth often stayed, and that he was acquainted with Booth. He positively identified the body aboard the *Montauk* as that of Booth. His statement was: "I distinctly recognize it as the body of J. Wilkes Booth—first, from the general appearance; next, from the India-ink letters 'J.W.B.' on his wrist, which I have very frequently noticed, and then by a scar on the neck. I also recognize the vest as that of J. Wilkes Booth." That is hardly an equivocal identification.

Another identifying witness aboard the *Montauk* was a physician, John Frederick May. Dr. May stated that he had been acquainted with Booth for at least eighteen months; indeed, he had removed a tumor from Booth's neck, which may well have caused the scar noted by Dawson. Although he stated that Booth had changed in appearance since he had last seen him, Dr. May said that he had "no doubt" that the body was that of Booth.

At least two other people—Seaton Moore, an attorney in Washington who had known Booth for two or three years, and William Crowninshield, an acting master in the United States Navy who had known Booth for a month and a half—also identified the body aboard the *Montauk*. Moore said that he was "confident" that the body was that of Booth. Crowninshield said he was "satisfied."

These identifications are recorded in official documents. There is, in addition, a great deal of unofficial supporting evidence, no less reliable than the conflicting evidence offered by appellants. An article in the February 27, 1869 issue of the New York *Clipper*, for example, describes in detail the disinterment of Booth's body from the Washington penitentiary and its removal to Weaver's place in Baltimore. The article reports that Joseph Booth, a brother of John Wilkes, "viewed the remains, and identified them beyond doubt by a peculiarly plugged tooth." In 1927, Blanche Chapman, in a letter to

Francis Wilson, who was preparing a biography of Booth, stated that, as an actress, she had known Booth, that she was called to the Weaver home to identify the body, and that, in the presence of Booth's mother, brother, and sister, she did so. Indeed, in her letter, she gives a poignant account, indicating that Booth's mother was also satisfied that the body was that of her son. In a letter written in 1886, Mrs. Elijah Rogers, who had been a neighbor of the Booths and had known John Wilkes, recounted that she too had seen the body at Weaver's, and she described it in some detail.

We could go on and on and on, for there is a carton of documentary evidence, including letters and articles written by Booth's brother and sister and some of their children. What, then, is the contrasting evidence? As noted, the petition and amended petition relied heavily on Finis Bates's book describing his encounters with John St. Helen and David George. Appellants now disavow reliance on that book, and for good reason. At least three expert witnesses declared it a fraud. Appellants are left, then, basically with the skepticism expressed by their "expert," Mr. Orlowek, and others who, over the years, have simply doubted the official version of what occurred without any clear affirmative evidence that it did not occur in that manner. It will suffice to say that Judge Kaplan was not clearly erroneous in finding that the man buried in the Booth family plot in June, 1869, was John Wilkes Booth and that Mr. Bates's story about John St. Helen and David George and Mr. Orlowek's skepticism were not sufficient reason to doubt the documented history.

## Other Considerations

As noted, Judge Kaplan also mentioned as reasons for denying the petition his belief that the remains were buried in an unknown location, that there may be other bodies buried on top of Booth's remains, that there may be severe water damage to the grave, that an identification may be inconclusive, and that the remains would have to be exposed for as long as six weeks. Appellants do not dispute that these would

be good reasons for denying a disinterment; they argue that there was no factual basis for those findings. They are wrong.

## The Gravesite

■ Appellants concede that Booth's actual gravesite is unmarked. The president of the cemetery testified that the cemetery "does not have an exact record of the location of John Wilkes Booth's grave. We simply have a speculation." Appellants urge, however, that the grave could be located. They point first to a diagram, appearing among cemetery records and indicating that Booth was buried just east of a monument, as "uncontroverted evidence" of the likely location of the grave. In fact, that exhibit, authenticated by the president of the cemetery, was characterized as a "possible indication" of the location.

Appellants also contend that, because the grave was lined with bricks, it would be possible, through the use of ground penetrating radar, to fix the location. There was conflicting evidence as to the reliability of that technique. Professor James Starrs, a forensic scientist, testified that ground penetrating radar "simply indicates an anomaly under the surface of the soil." He added:

"You will not see skulls. You will not see skeletonized remains. You will not even see a coffin. All you will see is a series [of] lines indicative of the fact that there is something different at that particular location from other locations in the area. Then it becomes a question of interpretation."

There was other evidence, from a descendant of Mr. Weaver, that Booth was not even buried in the Booth family plot.

■ Compounding this was evidence that, even if the body sought to be exhumed was buried where appellants believe it was, a casket containing the bodies of three infant siblings was buried on top of it. It appears that the three children, initially buried in Harford County, were reinterred with Booth, in the same grave, when he was buried in June, 1869. This led Professor Starrs to characterize the process not as an exhu-

mation, where there is a known burial spot of a particular person (even if the identity of that person is unknown), but rather as an "archaeological dig," where "there will be other persons whose remains may be exhumed at the same time."

Appellants do not contest that such a casket exists; they argue that the three children were "dust when buried" and thus are simply "part of the earth." This apparently derives from a newspaper article chronicling the event and referring to the casket of the children as "containing their dust." The article does not indicate that anyone actually saw what was in the casket, and the word "dust" may well have been more a poetic or Biblical allusion than actual fact. The court had a right to be concerned about disturbing the remains of three children and not to dismiss them so cavalierly as mere dust.

■ Finally, with respect to the gravesite, evidence was produced that the burial plot is at the bottom of a hilly area, that the soil there is acidic, and that there may be water damage to the lots. Water was discovered in a grave dug immediately adjacent to the Booth plot. Appellants dismiss that evidence as unreliable hearsay and assert that there was no evidence that the Booth plot itself was ever damaged by water. The second part of their argument is true; there was no evidence as to the condition of the Booth plot itself, much less the gravesite of John Wilkes Booth, which, as noted, is uncertain as to location in any event. Nonetheless, the court had a right to believe the evidence presented and to infer from it that water may have damaged the Booth plot as well.

### Likelihood of Reliable Identification

■ As with so much of this case, there was conflicting evidence as to whether, even if the body thought to be that of Booth was exhumed and examined, a reliable identification could be made of it. Appellants concede that no dental records of Booth exist from which any comparison could be made, although they assert that one could discover whether the person had a "plugged" tooth, which Booth was known to have had. They did produce evidence from Dr. Douglas

Uberlaker, Curator of Physical Anthropology at the Smithsonian Museum of Natural History, that, through the use of a technique known as photographic superimposition, it might be possible to determine whether the skull was not that of Booth, assuming that the exhumed skull was in satisfactory condition to test. Professor Starrs, however, characterized that technique as "clearly experimental in nature" and that studies were continuing to determine its accuracy. Moreover, Dr. Uberlaker, when asked about whether recovery of the skull could result in a positive identification, acknowledged:

"I also think it is unlikely that that will result in what we would consider to be a positive identification. You use that particular term. This is a term that we use forensically to indicate that this is the individual beyond all reasonable doubt. That the evidence for that usually comes from very detailed idiosyncratic features that are known to exist with an individual that we find on the remains; such as dental fillings, details, and radiographs, etcetera. And I've heard no one suggest that these types of materials exist known about John Wilkes Booth. And that will likely prevent us from making what we would consider to be a positive identification."

It was conceded by one of appellants' experts that DNA testing could not be done because, at present, there were no known matrilineal descendants of Booth and therefore no DNA with which any DNA recovered from the remains could be compared.

In light of this evidence, we cannot conclude that Judge Kaplan was clearly erroneous in finding that "an identification may be inconclusive."

*Time Needed for Examination*

■■■ The last finding with which appellants take issue is that the remains would need to be out of the grave for a minimum of six weeks, which the court found inappropriate. Appellants argue that there was no evidence to support that finding. They are wrong; there was such evidence. Dr.

Uberlaker, who would be part of the examining team, stated that he would want at least six weeks to complete the examination. He said it could be quicker, but that it could also take months.

## CONCLUSION

For the reasons noted, we conclude that Judge Kaplan did not err in dismissing the amended petition. He properly allowed Green Mount Cemetery to participate actively in the case; his factual conclusions were supported by substantial evidence; his legal conclusions were correct; and the judgment call he made was entirely appropriate.

JUDGMENT AFFIRMED;

APPELLANTS TO PAY THE COSTS.